# EXHIBIT B

# (Part 1 of 3)

**LOAN AGREEMENT**

Dated as of March 9, 2005

Between

**390 PARK AVENUE ASSOCIATES, LLC,**
as Borrower

and

**COLUMN FINANCIAL, INC.,**
as Lender

FIXED RATE SINGLE PROPERTY LOAN

Leasehold Interests in 390 Park Avenue
New York, New York
Loan Amount:  $110,000,000

# TABLE OF CONTENTS

**Page**

I.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION ........................................ 1
  Section 1.1.   Definitions........................................................................ 1
  Section 1.2.   Principles of Construction............................................. 22

II.  GENERAL TERMS........................................................................... 23
  Section 2.1.   Loan Commitment; Disbursement to Borrower ............. 23
  Section 2.2.   Interest Rate ................................................................ 23
  Section 2.3.   Loan Payment ............................................................... 24
  Section 2.4.   Prepayments ................................................................. 25
  Section 2.5.   Defeasance ................................................................... 26
  Section 2.6.   Release of Property ...................................................... 29
  Section 2.7.   Cash Management ........................................................ 31

III.  CONDITIONS PRECEDENT ......................................................... 34
  Section 3.1.   Conditions Precedent to Closing ................................. 34

IV.  REPRESENTATIONS AND WARRANTIES .................................. 37
  Section 4.1.   Borrower Representations ............................................. 37
  Section 4.2.   Survival of Representations ......................................... 48

V.  BORROWER COVENANTS ............................................................ 48
  Section 5.1.   Affirmative Covenants .................................................. 48
  Section 5.2.   Negative Covenants ..................................................... 58

VI.  INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS..... 62
  Section 6.1.   Insurance ...................................................................... 62
  Section 6.2.   Casualty ........................................................................ 65
  Section 6.3.   Condemnation .............................................................. 66
  Section 6.4.   Restoration ................................................................... 66

VII. RESERVE FUNDS........................................................................... 67
  Section 7.1.   Required Repair Funds ................................................. 67
  Section 7.2.   Tax and Insurance Escrow Fund ................................. 68
  Section 7.3.   Replacements and Replacement Reserve..................... 69
  Section 7.4.   Rollover Reserve .......................................................... 70
  Section 7.5.   Ground Rent Reserve Fund.......................................... 70
  Section 7.6.   Excess Cash Flow Reserve Funds................................ 71
  Section 7.7.   Reserve Funds, Generally ............................................ 72

VIII. DEFAULTS ..................................................................................... 73
  Section 8.1.   Event of Default ............................................................ 73
  Section 8.2.   Remedies....................................................................... 76

IX.  SPECIAL PROVISIONS ................................................................................. 77
    **Section 9.1.**   Sale of Note and Securitization.................................................. 77
    **Section 9.2.**   Securitization Indemnification................................................. 79
    **Section 9.3.**   Intentionally Omitted .............................................................. 82
    **Section 9.4.**   Exculpation ............................................................................. 82
    **Section 9.5.**   Matters Concerning Manager ................................................. 84
    **Section 9.6.**   Servicer ................................................................................... 85

X.  MISCELLANEOUS ...................................................................................... 85
    **Section 10.1.**   Survival ................................................................................ 85
    **Section 10.2.**   Lender's Discretion .............................................................. 85
    **Section 10.3.**   Governing Law .................................................................... 85
    **Section 10.4.**   Modification, Waiver in Writing ......................................... 86
    **Section 10.5.**   Delay Not a Waiver ............................................................. 87
    **Section 10.6.**   Notices ................................................................................. 87
    **Section 10.7.**   Trial by Jury ........................................................................ 88
    **Section 10.8.**   Headings .............................................................................. 88
    **Section 10.9.**   Severability ......................................................................... 88
    **Section 10.10.**  Preferences ........................................................................ 88
    **Section 10.11.**  Waiver of Notice ............................................................... 89
    **Section 10.12.**  Remedies of Borrower ...................................................... 89
    **Section 10.13.**  Expenses; Indemnity ........................................................ 89
    **Section 10.14.**  Schedules Incorporated .................................................... 90
    **Section 10.15.**  Offsets, Counterclaims and Defenses .............................. 90
    **Section 10.16.**  No Joint Venture or Partnership; No Third Party Beneficiaries .................. 90
    **Section 10.17.**  Publicity ............................................................................ 91
    **Section 10.18.**  Waiver of Marshalling of Assets ..................................... 91
    **Section 10.19.**  Waiver of Counterclaim.................................................... 91
    **Section 10.20.**  Conflict; Construction of Documents; Reliance ............. 91
    **Section 10.21.**  Brokers and Financial Advisors........................................ 92
    **Section 10.22.**  Prior Agreements .............................................................. 92
    **Section 10.23.**  Certain Additional Rights of Lender (VCOC)................... 92

## <u>SCHEDULES</u>

Schedule I    –    Rent Roll
Schedule II    –    Required Repairs – Deadlines for Completion
Schedule III    –    Organizational Structure

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of March 9, 2005 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **COLUMN FINANCIAL, INC.**, a Delaware corporation having an address at 11 Madison Avenue, New York, New York 10010 ("**Lender**") and **390 PARK AVENUE ASSOCIATES, LLC**, a Delaware limited liability company, having its principal place of business at c/o RFR Holding LLC, 390 Park Avenue, 3rd Floor, New York, New York 10022 ("**Borrower**").

## W I T N E S S E T H:

**WHEREAS**, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.        DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1.        Definitions**.    For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Additional Insolvency Opinion**" shall have the meaning set forth in Section 4.1.30(c) hereof.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"**Affiliated Loans**" shall mean a loan made by Lender to an Affiliate of Borrower or any Guarantor.

"**Affiliated Manager**" shall mean any Manager in which Borrower, Principal, or any Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"**Alcoa**" shall mean Alcoa, Inc.

"**Alcoa Lease (AGIMC Space)**" shall mean that certain lease, dated November 19, 1999, by and between Borrower, as lessor, and American General Investment Management Corporation ("**American General**"), lessee, demising the premises on the 5th, 6th, 7th, and 8th floors at the Property, as the same was assigned to Alcoa pursuant to an Assignment and Assumption of Lease, dated as of December 21, 2001, by and between American General, as assignor, and Alcoa, as assignee.

9800702.7

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alternative Security Agreement**" shall have the meaning set forth in Section 2.6.2 hereof.

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower for the applicable Fiscal Year or other period.

"**Applicable Interest Rate**" shall mean a fixed rate per annum equal to 5.526%.

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.11(d) hereof.

"**Approved Bank**" shall mean a bank or other financial institution which has a minimum long-term unsecured debt rating of at least "AA" by S&P and Fitch and "Aa2" by Moody's.

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, which is not discharged within sixty (60) days of filing against such Person, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise colluding in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person consenting to or colluding in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

9800702.7

"**Basic Carrying Costs**" shall mean, for any period, the sum of the following costs:  (a) Taxes and (b) Insurance Premiums.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Cash Management Account**" shall have the meaning set forth in Section 2.7.2(a) hereof.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, by and among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Trap Lease**" shall mean each of the following Leases: (i) the Thomas Weisel Lease; (ii) the Unilever Lease; and (iii) the Alcoa Lease (AGIMC Space).

"**Cash Trap Period**" shall mean each period commencing on a Cash Trap Trigger Date and terminating on the Cash Trap Termination Date which correlates to such Cash Trap Trigger Date.

"**Cash Trap Termination Amount**" shall mean the amount equal to the product of Fifty Dollars ($50.00) and the aggregate amount of rentable square feet of space for the Cash Trap Lease in question.

"**Cash Trap Termination Date**" shall mean the next succeeding Monthly Payment Date occurring after the date on which Lender shall have determined that Borrower has deposited (or there shall have been deposited) into the Excess Cash Flow Reserve Account the Cash Trap Termination Amount for the Cash Trap Lease which correlates to the Cash Trap Trigger Date in question.

"**Cash Trap Trigger Date**" shall mean:

(i)      with respect to the Thomas Weisel Lease, February 11, 2009, unless, prior to such date, Borrower has delivered documentary evidence satisfactory to Lender that the Tenant under the Thomas Weisel Lease has exercised its renewal option thereunder for the Thomas Weisel Main Premises, it being acknowledged and agreed that the aggregate amount of rentable square feet of space is 40,800;

(ii)      with respect to the Unilever Lease, January 11, 2013, unless prior to such date Borrower has delivered documentary evidence satisfactory to Lender that the Tenant under

the Unilever Lease has exercised its renewal option thereunder, it being acknowledged and agreed that the aggregate amount of rentable square feet of space is 38,920;

(iii)   with respect to the Alcoa Lease (AGIMC Space), July 11, 2014, unless, prior to such date Borrower, has delivered documentary evidence satisfactory to Lender that the Tenant under the Alcoa Lease (AGIMC Space) has exercised its renewal option thereunder, it being acknowledged and agreed that the aggregate amount of rentable square feet of space is 40,800; and

(iv)   with respect to the Thomas Weisel Lease, January 11, 2015, Borrower has delivered documentary evidence satisfactory to Lender that the Tenant under the Thomas Weisel Lease has exercised its renewal option thereunder for the Thomas Weisel Second Floor Premises, it being acknowledged and agreed that the aggregate amount of rentable square feet of space is 32,500.

"**Casualty**" shall have the meaning set forth in <u>Section 6.2</u> hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in <u>Section 6.4(b)</u> hereof.

"**Consumer Price Index**" shall mean the Consumer Price Index for all Urban Consumers (CPI-U) for the New York-Northern New Jersey-Long Island, NY-NJ-CT-PA, Area (All Items, 1982-84=100) published from time to time by the Bureau of Labor Statistics of the United States Department of Labor.

"**Covered Disclosure Information**" shall have the meaning set forth in <u>Section 9.2(b)</u> hereof.

"**CSFB**" shall mean Credit Suisse First Boston Corporation and its successors in interest.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums (including the Yield Maintenance Premium) due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage and the other Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal and/or interest payments due under this Agreement and the Note.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) four percent (4%) above the Applicable Interest Rate.

"**Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a)(i) hereof.

"**Defeasance Deposit**" shall mean an amount equal to the remaining principal amount of the Note, the Yield Maintenance Premium, any costs and expenses incurred or to be incurred in the purchase of U.S. Obligations necessary to meet the Scheduled Defeasance Payments and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of Sections 2.4 and 2.5 hereof.

"**Defeasance Event**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Lockout Date**" shall mean the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code for the REMIC Trust formed to securitize the Loan or, if portions of the Loan are included in more than one Securitization, the REMIC Trust formed for the last portion of the Loan that is securitized.

"**Defeased Note**" shall have the meaning set forth in Section 2.6.2 hereof.

"**Disclosure Document**" shall mean a prospectus, prospectus supplement, private placement memorandum, offering memorandum, offering circular, term sheet, road show presentation materials or other offering documents or marketing materials, in each case in preliminary or final form, used to offer Securities in connection with a Securitization.

"**Discount Rate**" shall mean the rate which, when compounded monthly, is equivalent to the Prepayment Treasury Rate when compounded semi-annually.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's and "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's).

"**Embargoed Person**" shall have the meaning set forth in Section 4.1.35 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 2.7.2(b) hereof.

"**Excess Cash Flow Reserve Account**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Cash Flow Reserve Fund**" shall have the meaning set forth in Section 7.6 hereof.

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a) hereof.

"**Extraordinary Expense**" shall have the meaning set forth in Section 5.1.11(e) hereof.

"**Fee Owner**" shall have the meaning set forth in the definition of "Ground Lease" below.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

9800702.7

"**Gross Income from Operations**" shall mean, for any period, all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source during such period, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-through or reimbursements paid by tenants under the Leases of any nature but excluding Rents from month-to-month tenants or tenants that are included in any Bankruptcy Action, sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, Insurance Proceeds and Condemnation Proceeds (other than business interruption or other loss of income insurance), and any disbursements to the Borrower from the Tax and Insurance Escrow Fund, the Replacement Reserve Fund or the Rollover Reserve Fund or any other escrow fund established by the Loan Documents.

"**Ground Lease**" shall mean that certain lease, dated as of October 1, 1952, by and between Metropolitan Life Insurance Company, as lessor, and Lever Brothers Company, as lessee, a memorandum of which was recorded on October 16, 1952 in the Office of the City Register of the County of New York (the "**Recording Office**") at Liber 4804, Cp 105, as renewed pursuant to that certain memorandum of renewal, dated September 22, 1964, recorded on March 29, 1965 in the Recorder's Office in Liber 5320, Cp 13, as said lease was restated by that certain Restated Lease Agreement, dated May 1, 1990, by and between 390 Tower Associates, as successor-in-interest to Metropolitan Life Insurance Company, as lessor, and Unilever United States, Inc., as successor-in-interest to Lever Brothers Company, as lessee, a memorandum of which, dated January 7, 1991, was recorded on January 7, 1991 in the Recorder's Office in Reel 1756, Page 268, as said Restated Lease was amended by unrecorded First Amendment of Lease, executed as of September 1, 1990, and as said lease was further modified by a certain Restated and Amended Agreement of Lease, dated as of December 18, 1998, by and between 390 Tower Associates, LLC, a Delaware limited liability company, and 390 Tower Associates, a New York limited partnership, collectively as lessor (collectively, the "**Fee Owner**"), and Borrower, as lessee (and successor-in-interest to Unilever United States, Inc. pursuant to that certain Assignment and Assumption Agreement, dated as of December 17, 1998, made by Unilever United States, Inc. and recorded on recorded on January 29, 1999 in the Recorder's Office in Reel 2809, Page 61), a memorandum of which Amended and Restated Lease was recorded in the Recorder's Office on January 29, 1999 in Reel 2809, Page 79, as said lease was further modified by unrecorded amendments of Restated Lease made by and among Fee Owner and Borrower, dated October 10, 2000 and March 18, 2001 (as the same may hereafter be modified, amended, extended, restated, renewed, substituted for or replaced, is herein referred to as the "**Ground Lease**"), as the same may hereafter be modified, amended, extended, restated, renewed, substituted for or replaced in accordance with the terms and conditions of this Agreement, pursuant to which the Fee Owner demised and leased to Borrower that certain real property commonly known as 390 Park Avenue situated in the City, County and State of New York more particularly described on Exhibit A attached to the Mortgage.

"**Ground Rent Reserve Account**" shall have the meaning set forth in Section 7.5.1 hereof.

"**Ground Rent Reserve Fund**" shall have the meaning set forth in Section 7.5.1 hereof.

"**Guarantor**" shall mean individually and collectively, as the context requires, Aby J. Rosen, an individual, Michael Fuchs, an individual and Harry Lis, an individual.

"**Guaranty**" shall mean that certain Guaranty Agreement, dated as of the date hereof, made by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Person**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Indemnifying Person**" shall mean each of Borrower and Principal.

"**Independent Director**" or "**Independent Manager**" shall mean a Person who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years:  (a) a stockholder, director (with the exception of serving as the Independent Director or Independent Manager), officer, employee, partner, member, attorney or counsel of Principal, Borrower or any Affiliate of either of them; (b) a customer, supplier or other person who derives any of its purchases or revenues from its activities with Principal, Borrower or any Affiliate of either of them; (c) a Person controlling or under common control with any such stockholder, director, officer, partner, member, customer, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, customer, supplier or other person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Insolvency Opinion**" shall mean that certain non-consolidation opinion letter dated the date hereof delivered by McDermott Will & Emery LLP in connection with the Loan.

"**Insurance Balancing Sums**" shall mean the amount Borrower is required to pay under Section 13.7 of the Ground Lease.

9800702.7

"**Insurance Premiums**" shall have the meaning set forth in <u>Section 6.1(b)</u> hereof.

"**Insurance Proceeds**" shall have the meaning set forth in <u>Section 6.4(b)</u> hereof.

"**Insurance Trustee**" shall mean any Person which is appointed or approved by each of Fee Owner, Lender and the holders of a mortgage encumbering the fee interest in the Property, to hold Insurance Proceeds and Condemnation Awards in respect of the Property; <u>provided</u>, <u>however</u>, that so long as such Person is, at the time of its appointment as insurance trustee, an Eligible Institution, each of the foregoing parties shall be deemed to have such Person.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and (a) every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Lease Term Sheet**" shall mean a term sheet for a proposed Lease at the Property executed by Borrower and by the proposed tenant thereunder, which shall set forth all of the material terms of the proposed Lease, including (a) the identity of the tenant and the location and square footage of the space to be leased, including expansion rights, if any; (b) the term of the proposed Lease, including renewal rights, if any; (c) the base or fixed minimum rent under the proposed Lease; (d) a description of any percentage rent obligations; (e) any free rent or other economic concessions provided under the proposed Lease; (f) a description of the costs of tenant improvements or work allowance and leasing commissions required under the proposed Lease; (g) a description of the tax, operating expense and other escalation provisions; (h) a description of cancellation and termination rights in favor of the tenant, if any; (i) assignment rights, if such assignment releases tenant from its obligations under the proposed Lease; and (j) other material terms of the proposed Lease.

"**Lease Termination Amounts**" shall have the meaning set forth in <u>Section 7.4.1</u> hereof.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

9800702.7

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable, clean sight draft letter of credit in favor of Lender and entitling Lender to draw thereon based solely on a statement executed by an officer of Lender stating that it has the right to draw thereon, and issued by a domestic Approved Bank or the U.S. agency or branch of a foreign Approved Bank, or if there are no domestic Approved Banks or U.S. agencies or branches of a foreign Approved Bank then issuing letters of credit, then such letter of credit may be issued by a domestic bank, the long term unsecured debt rating of which is the highest such rating then given by the Rating Agency or Rating Agencies, as applicable, to a domestic commercial bank, and upon which letter of credit Lender shall have the right to draw in full:  (a) if Lender has not received at least thirty (30) days prior to the date on which the then outstanding letter of credit is scheduled to expire, a notice from the issuing financial institution that it has renewed the applicable letter of credit; (b) thirty (30) days prior to the date of termination following receipt of notice from the issuing financial institution that the applicable letter of credit will be terminated; and (c) thirty (30) days after Lender has given notice to Borrower that the financial institution issuing the applicable letter of credit ceases to either be an Approved Bank or meet the rating requirement set forth above.  For the purposes of this definition, Independence Community Bank and M&T Bank shall each be deemed an "Approved Bank" with respect to those certain Letters of Credit delivered to Lender on the date hereof in connection with the Loan provided that if there is a downgrade in the long term unsecured debt rating of either of such banks from the related rating in effect as of the Closing Date, then such bank shall no longer be deemed an Approved Bank.

"**Liabilities**" shall have the meaning set forth in Section 9.2(b) hereof.

"**Licenses**" shall have the meaning set forth in Section 4.1.22 hereof.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Environmental Indemnity, the O&M Agreement, the Assignment of Management Agreement, the Guaranty, the Cash Management Agreement and all other documents executed and/or delivered in connection with the Loan.

"**Lockbox Account**" shall have the meaning set forth in Section 2.6.1(a) hereof.

"**Lockbox Agreement**" shall mean that certain Three Party Agreement Relating to Lockbox Services, dated as of the date hereof, by and among Borrower, Lockbox Bank and Lender.

9800702.7

"**Lockbox Bank**" shall mean Independence Community Bank or any successor or permitted assigns thereof.

"**Lockout Release Date**" shall mean the Payment Date occurring in December 11, 2014.

"**Management Agreement**" shall mean that certain Management Agreement, dated as of January 1, 1999, entered into by and between Borrower and Manager (including all exhibits and schedules thereto), pursuant to which Manager is to provide property management and other services with respect to the Property, or, if the context requires, a Replacement Management Agreement.

"**Manager**" shall mean RFR Realty LLC, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"**Maturity Date**" shall mean March 11, 2015, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall mean 390 Park Avenue Mezzanine LLC, a Delaware limited liability company, together with its successors and permitted assigns.

"**Mezzanine Cash Management Agreement**" shall have the meaning set forth in the Mezzanine Loan Documents.

"**Mezzanine Collection Account**" shall have the "Collection Account" as defined in the Mezzanine Loan Documents.

"**Mezzanine Lender**" shall mean Column Financial, Inc., a Delaware corporation, together with its successors and permitted assigns.

"**Mezzanine Loan**" shall mean that certain loan in the original principal amount of Ten Million and No/100 Dollars ($10,000,000.00) of even date herewith made by Mezzanine Lender to Mezzanine Borrower pursuant to the Mezzanine Loan Documents.

"**Mezzanine Loan Default**" shall mean an "Event of Default" under the Mezzanine Loan.

"**Mezzanine Loan Documents**" shall mean all documents evidencing the Mezzanine Loan and all documents executed and/or delivered in connection therewith.

"**Mezzanine Principal**" shall mean 390 Park Avenue Partners LLC, a Delaware limited liability company, together with its successors and permitted assigns.

"**Monthly Debt Service Payment Amount**" shall mean (a) from April 11, 2005 through and including March 11, 2008, a payment of interest only on the outstanding principal balance of the Loan for the applicable interest accrual period calculated in accordance with the terms of Section 2.3.3 hereof, and (b) from April 11, 2008 up to and including the Maturity Date, an amount equal to $626,363.49.

"**Monthly Mezzanine Debt Service Payment Amount**" shall mean the "Monthly Debt Service Payment Amount" as defined in the Mezzanine Loan Agreement.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean that certain first priority Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement, dated the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Multi-Party Agreement**" means that certain Multi-Party Agreement, dated as of December 17, 1998, among Borrower, Fee Owner and Unilever United States, Inc.

"**Net Cash Flow**" shall mean, for any period, the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Cash Flow Schedule**" shall have the meaning set forth in Section 5.1.11(b) hereof.

"**Net Operating Income**" shall mean the amount obtained by subtracting (a) Operating Expenses for the immediately preceding twelve (12) month period from (b) Gross Income from Operations for the immediately preceding three (3) month period calculated on an annualized basis.

"**Net Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**New Mezzanine Borrower**" shall have the meaning set forth in Section 9.1.2(b) hereof.

"**New Lender**" shall have the meaning set forth in Section 2.6.2 hereof.

"**New Mezzanine Loan**" shall have the meaning set forth in Section 9.1.2(b) hereof.

"**Note**" shall mean that certain Consolidated, Amended and Restated Promissory Note, dated as of the date hereof, in the principal amount of **ONE HUNDRED TEN MILLION AND NO/100 DOLLARS ($110,000,000.00)**, made by Borrower in favor of Lender, as the

same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**O&M Agreement**" shall mean that certain Operations and Maintenance Agreement, dated as of the date hereof, between Borrower and Lender given in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of the general partner or managing member of Borrower, as applicable.

"**Operating Expenses**" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP, of whatever kind during such period relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, management fees, payroll and related taxes, computer processing charges, tenant improvements and leasing commissions, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenditures, and contributions to the Replacement Reserve Fund, the Tax and Insurance Escrow Fund, the Rollover Reserve Fund and any other reserves required under the Loan Documents.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Payment Date**" shall mean the eleventh (11th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"**Permitted Encumbrances**" shall mean, collectively (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (c) carriers', warehousemen's, mechanic's, materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue or delinquent, or are being contested pursuant to Section 5.1.2 hereof, (d) Liens, if any, for Taxes imposed by any Governmental Authority or for Other Charges not yet due or delinquent, or being contested pursuant to Section 5.1.2 hereof or "insured over" or "insured around" to the reasonable satisfaction of Lender in the Title Insurance Policy, (e) utility and access easements of record which do not materially and adversely affect the value or use or operation of the Property, (f) rights of existing and future tenants, licensees and concessionaires, as tenants, licensees or concessionaires only, pursuant to Leases in effect as of the date hereof or entered into in accordance with the terms and conditions of this Agreement and the other Loan Documents, and (g) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's discretion.

9800702.7

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Release Date**" shall mean March 11, 2009.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Physical Conditions Report**" shall mean a report prepared by a company satisfactory to Lender regarding the physical condition of the Property, satisfactory in form and substance to Lender in its sole discretion.

"**Policies**" shall have the meaning specified in Section 6.1(b) hereof.

"**Prepayment Date**" shall have the meaning set forth in Section 2.4.4 hereof.

"**Prepayment Treasury Rate**" shall mean the Treasury Rate for the week ending prior to the Prepayment Date for U.S. Treasury constant maturities with maturity dates (one longer and one shorter) most nearly approximating the Maturity Date.

"**Principal**" shall mean 390 Park Avenue Mezzanine LLC, a Delaware limited liability company, which is a Special Purpose Entity and the sole member of Borrower, together with its successors and permitted assigns.

"**Property**" shall mean the Ground Lease, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clause of the Mortgage and referred to therein as the "Property".

"**Provided Information**" shall mean any and all financial and other information provided at any time by, or on behalf of, any Indemnifying Person with respect to the Property, Borrower, Principal, Guarantor and/or Manager, but, with the exception of any reports or financial statements from Borrower's accountants, shall not include any reports prepared by third parties, including the appraisal, the environmental report and the Physical Conditions Report for the Property prepared in connection with the Loan.

"**Qualified Manager**" shall mean either (a) Manager or (b) in the reasonable judgment of Lender, a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing Class A office properties in New York County, New York similar in size, scope, use and value as the Property, provided, that Borrower shall have obtained prior written confirmation from the applicable Rating Agencies that management of the Property by such Person will not cause a downgrade, withdrawal or qualification of the then current ratings of the Securities or any class thereof.

9800702.7

-14-

"**Rating Agencies**" shall mean each of S&P, Moody's and Fitch, or any other nationally recognized statistical rating agency which has been approved by Lender.

"**Recording Office**" shall have the meaning set forth in the definition of "Ground Lease" above.

"**Release Event**" shall mean after the occurrence of a Cash Trap Trigger Date, the termination of such Cash Trap Period on the Cash Trap Termination Date which correlates to such Cash Trap Trigger Date.

"**Related Party**" and "**Related Parties**" shall have the meaning set forth in Section 4.1.38(c).

"**Release Party**" and "**Release Parties**" shall have the meaning set forth in Section 4.1.30(b)(iv).

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Rents**" shall mean all rents (including, without limitation, percentage rents), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property, and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Lease**" shall have the meaning set forth in the definition of "Trapped Cash Release Date" below.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, provided, with respect to this subclause (ii), Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such management agreement will not cause a downgrade, withdrawal or qualification of the then current rating of the Securities or any class thereof; and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Replacement Reserve Account**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Replacement Reserve Fund**" shall have the meaning set forth in Section 7.3.1 hereof.

9800702.7

"**Replacement Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Replacement Tenant**" shall have the meaning set forth in the definition of "Trapped Cash Release Date" below.

"**Replacements**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Required Repair Account**" shall have the meaning set forth in Section 7.1.1 hereof.

"**Required Repair Fund**" shall have the meaning set forth in Section 7.1.1 hereof.

"**Required Repairs**" shall have the meaning set forth in Section 7.1.1 hereof.

"**Reserve Funds**" shall mean, collectively, the Tax and Insurance Escrow Fund, the Replacement Reserve Fund, the Rollover Reserve Fund, the Required Repair Fund, the Ground Rent Reserve Fund, the Excess Cash Flow Reserve Fund and any other escrow fund established pursuant to the Loan Documents.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restricted Party**" shall mean, collectively, Borrower, Mezzanine Borrower, Mezzanine Principal and any Affiliated Manager.

"**Rollover Reserve Account**" shall have the meaning set forth in Section 7.4.1 hereof.

"**Rollover Reserve Fund**" shall have the meaning set forth in Section 7.4.1 hereof.

"**Rollover Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.4.1 hereof.

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance or pledge of a legal or beneficial interest.

"**Scheduled Defeasance Payments**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Securities**" shall have the meaning set forth in Section 9.1 hereof.

9800702.7

"**Securities Act**" shall have the meaning set forth in <u>Section 9.2(a)</u> hereof.

"**Securitization**" shall have the meaning set forth in <u>Section 9.1</u> hereof.

"**Security Agreement**" shall have the meaning set forth in <u>Section 2.5.1(a)(v)</u> hereof.

"**Servicer**" shall have the meaning set forth in <u>Section 9.6</u> hereof.

"**Servicing Agreement**" shall have the meaning set forth in <u>Section 9.6</u> hereof.

"**Severed Loan Documents**" shall have the meaning set forth in <u>Section 8.2(b)</u> hereof.

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company which at all times on and after the Closing Date:

(a)     is organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; or (ii) acting as a general partner of the limited partnership that owns the Property or managing member of the limited liability company that owns the Property;

(b)     is not engaged and will not engage in any business unrelated to (i) the acquisition, development, ownership, management or operation of the Property, (ii) acting as general partner of the limited partnership that owns the Property or (iii) acting as a managing member of the limited liability company that owns the Property, as applicable;

(c)     does not have and will not have any assets other than those related to the Property or its partnership interest in the limited partnership or the member interest in the limited liability company that owns the Property or acts as the general partner or managing member thereof, as applicable;

(d)     has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement, as applicable (except, with respect to amendments expressly permitted under the terms of Borrower' limited liability company operating agreement) with respect to the matters set forth in this definition;

(e)     if such entity is a limited partnership, has, as its only general partners, Special Purpose Entities that are corporations, limited partnerships or limited liability companies and each owns at least a one-half of one percent (0.5%) direct interest in such limited partnership;

(f)     if such entity is a corporation, has at least two (2) Independent Directors, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless two (2) Independent Directors shall have participated in such vote;

(g)     if such entity is a limited liability company with more than one (1) member, has at least one (1) member that is a Special Purpose Entity that is a corporation that has at least two (2) Independent Directors and that owns at least a one-half of one percent (0.5%) direct equity interest in the limited liability company;

(h)     if such entity is a limited liability company with only one (1) member, is a limited liability company organized in the State of Delaware that has (i) as its only member a non-managing member, (ii) at least two (2) Independent Directors and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the directors unless two (2) Independent Directors shall have participated in such vote and (iii) at least two (2) springing members, one of which will become the member of such entity upon the dissolution of the last remaining member;

(i)     if such entity is (i) a limited liability company, has articles of organization, a certificate of formation and/or an operating agreement, as applicable, (ii) a limited partnership, has a limited partnership agreement, or (iii) a corporation, has a certificate of incorporation or articles that, in each case, provide that such entity will not: (A) dissolve, merge, liquidate, consolidate; (B) sell all or substantially all of its assets or the assets of Borrower (as applicable); (C) engage in any other business activity, or amend its organizational documents with respect to the matters set forth in this definition without the consent of Lender; or (D) without the prior written affirmative vote of two (2) Independent Directors or Independent Managers and all of the other directors of such entity or of the Special Purpose Entity that is the general partner or the managing member of such entity, file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest;

(j)     is solvent and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) to the extent of its assets as the same shall become due, and is maintaining and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(k)     has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(l)     has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns, except to the extent that it is required to file consolidated tax returns by law;

9800702.7
-18-

(m)     has maintained and will maintain its own records, books, resolutions and agreements;

(n)     (i) has not commingled and will not commingle its funds or assets with those of any other Person and (ii) has not participated and will not participate in any cash management system with any Person, except with Lender and Manager as provided in the Cash Management Agreement;

(o)     has held and will hold its assets in its own name;

(p)     has conducted and will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in Subsection (dd) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(q)     has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(r)     has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations;

(s)     has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(t)     has and will have no Indebtedness other than (i) the Loan, (ii) liabilities incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed three percent (3%) of the principal balance of the Loan which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, and (iii) such other liabilities that are permitted pursuant to this Agreement;

(u)     has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Agreement;

(v)     has not and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(w)     has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(x)      maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name.  The stationery, invoices, and checks utilized by the Special Purpose Entity or utilized to collect its funds or pay its expenses shall bear its own name and shall not bear the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(y)      has not pledged and will not pledge its assets for the benefit of any other Person;

(z)      has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in <u>Subsection (dd)</u> below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(aa)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(bb)      has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(cc)      has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(dd)      has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (ii) in connection with this Agreement and the other Loan Documents;

(ee)      has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(ff)      if such entity is a corporation, it shall consider the interests of its creditors in connection with all corporate actions;

(gg)      does not and will not have any of its obligations guaranteed by any Affiliate (except as provided in the Loan Documents);

(hh)   has complied and will comply with all of the terms and provisions contained in its organizational documents.  The statement of facts contained in its organizational documents are true and correct and will remain true and correct; and

(ii)   will not form, acquire or hold any subsidiary or own equity interest in any other entity.

"**State**" shall mean the State of New York.

"**Successor Borrower**" shall have the meaning set forth in Section 2.5.3 hereof.

"**Survey**" shall mean a survey of the Property prepared pursuant to the requirements contained in Section 4.1.27 hereof.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"**Thomas Weisel Lease**" shall mean that certain lease, dated as of May 5, 1999, by and between Thomas Weisel Partners Group, LLC, as lessee, as the same was amended by (i) that certain Expansion Option Side Letter, dated as of June 3, 1999, (ii) that certain Lease Amendment, dated as of October 1, 1999 and (iii) that certain Third Amendment to Lease, dated as of May 2003.

"**Thomas Weisel Main Premises**" shall mean the premises demised under the Thomas Weisel Lease, excluding the Thomas Weisel Second Floor Premises.

"**Thomas Weisel Second Floor Premises**" shall mean the second floor of the Property demised under the Thomas Weisel Lease.

"**Threshold Amount**" shall have the meaning set forth in Section 5.1.21 hereof.

"**Title Insurance Policy**" shall mean an ALTA mortgagee title insurance policy in a form (acceptable to Lender) (or, if the Property is in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Mortgage.

"**Transfer**" shall have the meaning set forth in Section 5.2.10(b) hereof.

"**Trapped Cash Release Date**" shall mean the date, if any, on which Lender determines, based on evidence satisfactory to Lender, in its reasonable discretion, delivered by Borrower, that all of the following conditions have been satisfied with respect to the Cash Trap Lease that gave rise to the Cash Trap Trigger Date in question: (a) all of the space in the Improvements leased under the applicable Cash Trap Lease as of the date hereof has been relet to the tenant thereunder or to a new tenant or tenants satisfactory to Lender in its reasonable

discretion (each a "**Replacement Tenant**") pursuant to a lease or leases, satisfactory to Lender in its reasonable discretion (each such Lease, a "**Replacement Lease**"); and (b) each Replacement Tenant has delivered to Lender a duly executed tenant estoppel certificate, reflecting that Borrower has satisfied all of its obligations in respect of such reletting (including, without limitation, landlord's work, tenant improvement obligations, tenant allowance obligations and lease buy-out obligations) and otherwise in form and substance reasonably satisfactory to Lender.

"**Treasury Rate**" shall mean the yield, calculated by linear interpolation (rounded to the nearest one-thousandth of one percent (i.e., 0.001%) of the yields of noncallable United State Treasury obligations with terms (one longer and one shorter) most nearly approximately the period from such date of determination to the Maturity Date, as determined by Lender on the basis of Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Governmental Security/Treasury Constant Maturities, or other recognized source of financial market information selected by Lender.

"**Trigger Event**" shall mean any period during which a Cash Trap Period is in effect.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"**U.S. Obligations**" shall mean non-redeemable securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged.

"**Unilever Lease**" shall mean that certain lease, dated December 17, 1998, by and between Borrower, as lessor, and Unilever United States, Inc., as lessee.

"**Yield Maintenance Premium**" shall mean the amount (if any) which, when added to the remaining principal amount of the Note, will be sufficient to purchase U.S. Obligations providing the required Scheduled Defeasance Payments.

Section 1.2.   **Principles of Construction.**   All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.   GENERAL TERMS

**Section 2.1.   Loan Commitment; Disbursement to Borrower.**

**2.1.1   Agreement to Lend and Borrow.**  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

**2.1.2   Single Disbursement to Borrower.**  Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

**2.1.3   The Note, Mortgage and Loan Documents.**  The Loan shall be evidenced by the Note and secured by the Mortgage, the Assignment of Leases and the other Loan Documents.

**2.1.4   Use of Proceeds.**  Borrower shall use the proceeds of the Loan to (a) acquire the Property and/or repay and discharge any existing loans relating to the Property or any direct or indirect interests therein, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Property, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Property and (f) distribute the balance, if any, to Borrower.

**Section 2.2.   Interest Rate.**

**2.2.1   Interest Rate.**  Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to but excluding the Maturity Date at the Applicable Interest Rate.

**2.2.2   Intentionally Omitted.**

**2.2.3   Interest Calculation.**  Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year by (c) the outstanding principal balance.

**2.2.4   Default Rate.**  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

**2.2.5   Usury Savings.**  This Agreement, the Note and the other Loan Documents are subject to the express **condition** that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If,

9800702.7

by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, then the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### Section 2.3.    Loan Payment.

**2.3.1    Payment Before Maturity Date.**  Borrower shall pay to Lender (a) on the Closing Date, an amount equal to interest only on the outstanding principal balance of the Loan from the Closing Date up to but not including March 10, 2005 (unless such Closing Date is the eleventh (11th) day of the month, in which case no such interest only payment shall be due), and (b) commencing on April 11, 2005 and on each Payment Date thereafter up to and including the Maturity Date, Borrower shall make a payment to Lender in an amount equal to the Monthly Debt Service Payment Amount, which payments shall be applied first to accrued and unpaid interest and the balance, if any, to principal.

**2.3.2    Intentionally Omitted.**

**2.3.3    Payments Generally.**  The first interest accrual period hereunder shall commence on and include the Closing Date and end on March 10, 2005.  Each interest accrual period thereafter shall commence on the eleventh (11th) day of each calendar month during the term of the Loan and shall end on and include the tenth (10th) day of the next occurring calendar month.  For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods, if the day on which such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day and with respect to payments of principal due on the Maturity Date, interest shall be payable at the Applicable Interest Rate or the Default Rate, as the case may be, through and including the day immediately preceding such Maturity Date.  All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

**2.3.4    Payment on Maturity Date.**  Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

**2.3.5    Late Payment Charge.**  If any principal, interest or any other sums due under the Loan Documents (other than the outstanding principal balance due on the Maturity Date) is not paid by Borrower by the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or

the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.

        **2.3.6**  **Method and Place of Payment.**  Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender at least two (2) Business Days prior to the date such payment is due, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

        **Section 2.4.**  **Prepayments.**

        **2.4.1**  **Voluntary Prepayments.**  Prior to the Lockout Release Date, the outstanding principal amount of the Loan may not be prepaid in whole or in part. On any Payment Date occurring on, or after, the Lockout Release Date, Borrower may, at its option and upon fifteen (15) days' prior notice to Lender, prepay the Debt in whole or in part; provided that such prepayment is accompanied by (a) all interest which would have accrued on the amount of the Loan to be paid through and including the last day of the interest period related to the Payment Date next occurring following the date of such prepayment, or, if such prepayment occurs on a Payment Date, through and including the last day of the interest period related to such Payment Date; (b) all other sums due and payable under this Agreement, the Note, and the other Loan Documents, including, but not limited to all of Lender's costs and expenses (including reasonable attorney's fees and disbursements) incurred by Lender in connection with such prepayment; and (c) the applicable Yield Maintenance Premium, if any. Lender shall not be obligated to accept any prepayment of the Debt under this Section 2.4.1 unless it is accompanied by the Yield Maintenance Premium due in connection therewith. Notwithstanding anything herein to the contrary, any prepayment notice may be rescinded by Borrower upon delivery of written notice to Lender on or prior to the date that is five (5) Business Days prior to the date specified for prepayment in such prepayment notice, provided that Borrower shall be responsible for the reasonable costs and expenses incurred by Lender in connection with the delivering and/or the rescission of such prepayment notice.

        **2.4.2**  **Mandatory Prepayments.**  On the next occurring Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender is not obligated to make such Net Proceeds available to Borrower for Restoration, Borrower shall prepay, or authorize Lender to apply Net Proceeds as a prepayment of, the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds; provided, however, if an Event of Default has occurred and is continuing, Lender may apply such Net Proceeds to the Debt (until paid in full) in any order or priority in its sole discretion. Other than following the occurrence and during the continuance of an Event of Default, no Yield Maintenance Premium (or other premium or penalty) shall be due in connection with any prepayment made pursuant to this Section 2.4.2 or Section 5.3 of the Mortgage. Following any partial prepayment of the outstanding principal amount of the Loan under this Section 2.4.2 occurring after April 11, 2008, the Monthly Debt Service Payment Amount shall be recomputed

at the Applicable Interest Rate and the outstanding principal balance of the Loan remaining following such application, based upon an amortization schedule of 360 months <u>less</u> the number of months from April 11, 2008 to the date of the application of such proceeds.

         **2.4.3   <u>Prepayments After Default</u>.**  If, following the occurrence and during the continuance of an Event of Default, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender (including through application of any Reserve Funds), such tender or recovery shall be (a) made on the next occurring Payment Date together with the Monthly Debt Service Payment Amount (and the Yield Maintenance Premium, if applicable) calculated at the Default Rate from and after the date of such Event of Default and (b) if such tender or recovery occurs (i) prior to the Lockout Release Date, deemed a voluntary prepayment by Borrower in violation of the prohibition against prepayment set forth in <u>Section 2.4.1</u> hereof and Borrower shall pay, in addition to the Debt, an amount equal to the greater of (x) three percent (3%) of the outstanding principal balance of the Loan to be prepaid or satisfied or (y) the Yield Maintenance Premium that would be required if a Defeasance Event had occurred in an amount equal to the outstanding principal amount of the Loan to be prepaid or satisfied, and (ii) on or after the Lockout Release Date, Borrower shall pay, in addition to the Debt, the Yield Maintenance Premium.

         **2.4.4   <u>Prepayment During Defeasance Lockout</u>.**  If the Permitted Release Date has occurred, but the Defeasance Lockout Date has not occurred, the Debt may be prepaid in whole (but not in part) prior to the date permitted under <u>Section 2.4.1</u> hereof upon not less than thirty (30) days prior notice to Lender specifying the Payment Date on which prepayment is to be made (a "**Prepayment Date**") provided no Event of Default exists and upon payment of an amount equal to the greater of (a) the present value as of the Prepayment Date of the remaining scheduled payments of principal and interest due pursuant to the Loan Documents from the Prepayment Date through the Maturity Date (including an amount equal to the outstanding principal balance of the Loan on the Maturity Date) determined by discounting such payments at the Discount Rate, less the amount of principal being prepaid, and (b) one percent (1%) of the outstanding principal balance of the Loan as of the Prepayment Date.  Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration.  If any notice of prepayment is given, the Debt shall be due and payable on the Prepayment Date.  Lender shall not be obligated to accept any prepayment of the Debt under this <u>Section 2.4.4</u> unless it is accompanied by the prepayment consideration due in connection therewith.

       **Section 2.5.   <u>Defeasance</u>.**

         **2.5.1   <u>Voluntary Defeasance</u>.**  (a) Provided no Event of Default shall then exist and so long as the Defeasance Lockout Date has occurred, Borrower shall have the right at any time prior to the date voluntarily prepayments are permitted under <u>Section 2.4.1</u> hereof to voluntarily defease the Loan in whole, but not in part, by and upon satisfaction of the following conditions (such event being a "**Defeasance Event**"):

         (i)       Borrower shall provide not less than thirty (30) days prior written notice to Lender specifying the Payment Date (the "**Defeasance Date**") on which the Defeasance Event shall occur;

(ii)     Borrower shall pay to Lender all accrued and unpaid interest on the principal balance of the Loan to and including the Defeasance Date;

(iii)    Borrower shall pay to Lender all other sums, not including scheduled interest or principal payments, then due under the Note, this Agreement, the Mortgage and the other Loan Documents;

(iv)    Borrower shall deliver to Lender that portion of the Defeasance Deposit not required for the purchase of U.S. Obligations required to be purchased under this Section 2.5.1;

(v)     Borrower shall execute and deliver a pledge and security agreement, in form and substance that would be reasonably satisfactory to a prudent lender creating a first priority lien on the Defeasance Deposit and the U.S. Obligations purchased with the Defeasance Deposit in accordance with the provisions of this Section 2.5 (the "**Security Agreement**");

(vi)    Borrower shall deliver an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that Borrower has legally and validly transferred and assigned the U.S. Obligations and all obligations, rights and duties under and to the Note to the Successor Borrower, that Lender has a perfected first priority security interest in the Defeasance Deposit and the U.S. Obligations delivered by Borrower and that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such Defeasance Event;

(vii)   Borrower shall deliver confirmation in writing from the applicable Rating Agencies to the effect that such release will not result in a downgrade, withdrawal or qualification of the respective ratings in effect immediately prior to such Defeasance Event for the Securities issued in connection with the Securitization which are then outstanding.  If required by the applicable Rating Agencies, Borrower shall also deliver or cause to be delivered a non-consolidation opinion with respect to the Successor Borrower in form and substance satisfactory to Lender and the applicable Rating Agencies;

(viii)  Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.5.1(a) have been satisfied;

(ix)    Borrower shall deliver a certificate of Borrower's independent certified public accountant certifying that the U.S. Obligation purchased with the Defeasance Deposit generate monthly amounts equal to or greater than the Scheduled Defeasance Payments;

(x)     Borrower shall deliver such other certificates, documents or instruments as Lender may reasonably request which shall be then customary or necessary for the Defeasance Event; and

9800702.7

(xi)    Borrower shall pay all costs and expenses of Lender incurred in connection with the Defeasance Event, including (A) any costs and expenses associated with a release of the Lien of the Mortgage as provided in Section 2.6 hereof, (B) reasonable attorneys' fees and expenses incurred in connection with the Defeasance Event, (C) the costs and expenses of the Rating Agencies, and (D) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note, or otherwise required to accomplish the defeasance.

(b)    In connection with the Defeasance Event, Borrower shall use the Defeasance Deposit to purchase U.S. Obligations which provide payments on or prior to, but as close as possible to, all successive scheduled Payment Dates after the Defeasance Date upon which interest and principal payments are required under this Agreement and the Note and in amounts equal to the scheduled payments due on such Payment Dates under this Agreement and the Note (including, without limitation, scheduled payments of principal, interest, servicing fees (if any), and any other amounts due under the Loan Documents on such dates) and assuming such Note is prepaid in full on the Maturity Date (the "**Scheduled Defeasance Payments**"). Borrower, pursuant to the Security Agreement or other appropriate document, shall authorize and direct that the payments received from the U.S. Obligations may be made directly to the Lockbox Account (unless otherwise directed by Lender) and applied to satisfy the obligations of Borrower under this Agreement and the Note. Any portion of the Defeasance Deposit in excess of the amount necessary to purchase the U.S. Obligations required by this Section 2.5 and satisfy Borrower's other obligations under this Section 2.5 and Section 2.6 shall be remitted to Borrower.

2.5.2    **Collateral.**    Each of the U.S. Obligations that are part of the defeasance collateral shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be satisfactory to a prudent lender (including, without limitation, such instruments as may be required by the depository institution holding such securities or by the issuer thereof, as the case may be, to effectuate book-entry transfers and pledges through the book-entry facilities of such institution) in order to perfect upon the delivery of the defeasance collateral a first priority security interest therein in favor of the Lender in conformity with all applicable state and federal laws governing the granting of such security interests.

2.5.3    **Successor Borrower.**    In connection with a Defeasance Event, Borrower may at its option, or if so required by the applicable Rating Agencies shall, establish or designate a successor entity (the "**Successor Borrower**") which shall be a single purpose bankruptcy remote entity with one (1) Independent Director approved by the Rating Agencies, and Borrower shall transfer and assign all obligations, rights and duties under and to the Note, together with the pledged U.S. Obligations to such Successor Borrower. Such Successor Borrower shall assume the obligations under the Note and the Security Agreement and Borrower shall be relieved of its obligations under such documents. Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement. Notwithstanding anything in this Agreement to the contrary, no other assumption fee shall be payable upon a transfer of the Note in accordance with this Section 2.5.3, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable

attorneys' fees and expenses and any fees and expenses of any Rating Agencies, incurred in connection therewith.

**Section 2.6.** **Release of Property.** Except as set forth in this Section 2.6, no repayment, prepayment or defeasance of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Mortgage.

**2.6.1** **Release upon Defeasance.** (a) If Borrower has elected to defease the entire Loan and the requirements of Section 2.5 and this Section 2.6 have been satisfied, the Property shall be released from the Lien of the Mortgage and the U.S. Obligations pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Note.

(b) In connection with the release of the Mortgage, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date, a release of Lien (and related Loan Documents) for the Property for execution by Lender. Such release of Lien (and related Loan Documents) shall be in a form appropriate in the jurisdiction in which the Property is located and that would be satisfactory to a prudent lender. In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such releases in accordance with the terms of this Agreement. Lender shall furnish Borrower, at Borrower's sole cost and expense, with such other documents (if any) as Borrower may reasonably require to effectuate and evidence the release of the Mortgage and the Lien created thereby.

**2.6.2** **Assignment of Note and Mortgage.** If Borrower has requested in the notice delivered to Lender pursuant to Section 2.5.1 that Lender, in connection with a Defeasance Event, assign the Note and Mortgage to a new lender (the "**New Lender**") providing the funds required to acquire the Defeasance Deposit, Borrower and Lender shall cooperate to effect such proposed assignment in the following manner:

(a) Lender shall assign the Note and the Mortgage, each without recourse, covenant or warranty of any nature, express or implied, to the New Lender designated by Borrower (other than Borrower or a nominee of Borrower) provided that:

(i) Borrower has executed and delivered to the New Lender a new note (the "**Defeased Note**"); the Defeased Note shall have the same term, interest rate, unpaid principal balance and all other material terms and conditions of the Note;

(ii) Borrower has executed and delivered to the New Lender a security agreement (the "**Alternative Security Agreement**") in form and substance reasonably satisfactory to Lender, securing the Defeased Note and creating a first priority lien on the Defeasance Deposit;

(iii) New Lender assigns the Defeased Note, together with the Alternative Security Agreement to Lender simultaneously with the assignment of the Note and Mortgage by Lender to New Lender;

9800702.7

(iv)     Borrower has complied with all other provisions of <u>Section 2.5</u> and this <u>Section 2.6</u> hereof;

(v)     Borrower has paid, simultaneously with the assignment of the Note and Mortgage by Lender, (1) Lender's then customary administrative fee for processing assignments of mortgage equal to $7,500; (2) the reasonable out-of-pocket expenses of Lender incurred in connection therewith; and (3) Lender's reasonable attorneys' fees for the preparation and delivery of such an assignment;

(vi)     Borrower shall have caused the delivery of an executed Statement of Oath under Section 275 of the New York Real Property Law from a Person authorized by applicable law to deliver such statement;

(vii)     New Lender shall materially modify the Note such that it shall be treated as a new loan for federal tax purposes;

(viii)     such assignment is not then prohibited by any federal, state or local law, rule, regulation, order or by any Governmental Authority;

(ix)     such assignment and the actions described above do not constitute a prohibited transaction for any REMIC Trust formed pursuant to a Securitization and will not disqualify such REMIC Trust as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such assignment and the Defeasance Event and an opinion of counsel to Borrower to that effect is delivered to Lender in a form that would be reasonably satisfactory to a prudent lender;

(x)     Borrower shall provide such other opinions, items, information and documents which a prudent lender, acting reasonably, would require to effectuate such assignment; and

(xi)     Borrower shall be responsible for all mortgage recording taxes, if any, recording fees, if any, and other similar charges payable in connection with any such assignment.

(b)     Lender agrees that the assignment of the Note and Mortgage to the New Lender and the assignment of the Defeased Note, the Defeasance Deposit and the Alternative Security Agreement by the New Lender to Lender shall be accomplished by an escrow closing conducted through an escrow agent reasonably satisfactory to Lender and the New Lender and pursuant to an escrow agreement reasonably satisfactory to Lender and the New Lender in form and substance.

     **2.6.3**  <u>**Release on Payment in Full.**</u>  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Agreement, release the Lien of the Mortgage.

**2.6.4   Assignment upon Repayment of Debt.**  Notwithstanding Section 2.6.3 hereof to the contrary, upon the request of Borrower and upon the repayment or prepayment of the Loan in full by Borrower in accordance with the terms of this Agreement and the other Loan Documents (excluding repayments or prepayments in connection with Defeasance Event), Lender shall assign the original Note and the Mortgage, each without recourse, covenant or warranty of any nature, express or implied (except with respect to the amount of the Debt and that the Lien of the Mortgage has not been previously assigned by Lender), to such new mortgagee designated by Borrower (other than Borrower or a nominee of Borrower) and shall provide such mortgagee with duplicate copies of the original Loan Documents; provided, that Borrower has (a) caused to be paid Lender's administrative fee for processing assignments of mortgage equal to $7,500, the reasonable out-of-pocket expenses of Lender incurred in connection therewith and Lender's reasonable attorneys' fees for the preparation, delivery and performance of such an assignment, (b) caused the delivery of an executed Statement of Oath under Section 275 of the New York Real Property Law, (c) provided such other information and documents which a prudent mortgagee would reasonably require to effectuate such assignment, and (d) otherwise complied with all applicable Legal Requirements. Borrower shall be responsible for all mortgage recording taxes, recording fees and other charges payable in connection with any such assignment.

**Section 2.7.   Cash Management.**

**2.7.1   Lockbox Account.**  (a) Borrower shall establish and maintain a segregated Eligible Account (the "**Lockbox Account**") with Lockbox Bank in trust for the benefit of Lender.  Upon the occurrence of a Trigger Event and until the occurrence of the related Release Event or upon the occurrence and during the continuance of an Event of Default, the Lockbox Account shall be under the sole dominion and control of Lender.  The Lockbox Account shall be entitled "Column Financial, Inc. - Lockbox Account".  Borrower hereby grants to Lender a first priority security interest in the Lockbox Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Lockbox Account, including, without limitation, executing and filing UCC-1 Financing Statements and continuations thereof. Provided that no Event of Default has occurred and is continuing, at any time that is prior to a Trigger Event or after the related Release Event, Borrower shall have the sole right to make withdrawals from the Lockbox Account, including, without limitation, the right to sweep the account on a daily basis.  Upon the occurrence of a Trigger Event (but prior to the related Release Event) or an Event of Default (but prior to the acceptance by Lender of any cure thereof), Lender shall provide notice of such occurrence to Lockbox Bank and thereafter Lender and Servicer shall have the sole right to make withdrawals from the Lockbox Account in accordance with this Agreement and the other Loan Documents until such time as (i) an applicable Release Event occurs or (ii) in the case of an Event of Default, Lender shall have accepted a cure thereof.  All costs and expenses for establishing and maintaining the Lockbox Account shall be paid by Borrower in accordance with this Agreement and the other Loan Documents.

(b)   Borrower shall, or shall cause Manager to, deliver irrevocable written instructions to all tenants under Leases to deliver all Rents payable thereunder directly to the Lockbox Account.  Borrower shall, and shall cause Manager to, deposit all amounts received by

Borrower or Manager constituting Rents into the Lockbox Account within three (3) Business Days after receipt.

(c)      Borrower shall obtain from Lockbox Bank its agreement that, upon notice from Lender of the occurrence of a Trigger Event or an Event of Default, Lockbox Bank shall transfer to the Cash Management Account in immediately available funds by federal wire transfer all amounts on deposit in the Lockbox Account once every Business Day until such time as Lockbox Bank receives notice from Lender of the occurrence of the related Release Event or cure of Event of Default accepted by Lender in its sole discretion, which notice Lender shall deliver to Lockbox Bank promptly upon the occurrence of such Release Event or accepted cure, as applicable.

(d)      The sufficiency of funds on deposit in the Lockbox Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

2.7.2   **Cash Management Account.**   (a) Borrower shall establish and maintain a segregated Eligible Account (the "**Cash Management Account**") to be held by Servicer in trust for the benefit of Lender, which Cash Management Account shall be under the sole dominion and control of Lender.  The Cash Management Account shall be entitled "Column Financial, Inc. - Cash Management Account".  Borrower hereby grants to Lender a first priority security interest in the Cash Management Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Cash Management Account, including, without limitation, executing and filing UCC-1 Financing Statements and continuations thereof. Borrower will not in any way alter or modify the Cash Management Account and will notify Lender of the account number thereof.  Lender shall have the sole right to make withdrawals from the Cash Management Account and all costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Borrower.

(b)      Provided no Event of Default shall have occurred and be continuing, after the occurrence of a Trigger Event and prior to the occurrence of the related Release Event, on each Payment Date all funds on deposit in the Cash Management Account shall be applied by Lender to the payment of the following items in the order indicated:

(i)      First, payments to the Ground Rent Reserve Fund in accordance with the terms and conditions of Section 7.5 hereof;

(ii)      Second, payments to the Tax and Insurance Escrow Fund in accordance with the terms and conditions of Section 7.2 hereof;

(iii)      Third, payment of the Monthly Debt Service Payment Amount in accordance with the terms and conditions hereof;

(iv)      Fourth, payments to the Replacement Reserve Fund in accordance with the terms and conditions of Section 7.3 hereof;

(v)     Fifth, payments to Rollover Reserve Fund in accordance with the terms and conditions of Section 7.4 hereof;

(vi)     Sixth, payment to Lender of any other amounts then due and payable under the Loan Documents;

(vii)     Seventh, payment to Borrower of an amount sufficient to pay the monthly Operating Expenses pursuant to the Approved Annual Budget (but excluding therefrom any payment to any Manager which is an Affiliate of Borrower);

(viii)     Eighth, payment to Borrower of an amount sufficient to pay Extraordinary Expenses, if any;

(ix)     Ninth, funds necessary to pay the Monthly Mezzanine Debt Service Payment Amount shall be transferred to the Mezzanine Collection Account under the Mezzanine Cash Management Agreement, which amounts shall be deemed to be distributed by Borrower to Mezzanine Borrower pursuant to Borrower's operating agreement;

(x)     Tenth, so long as a Trigger Event has occurred that is solely due to a Cash Trap Period being in effect, all amounts then remaining after payment of items (i) through (ix) above in the Cash Management Account (such amounts, if any, the "**Excess Cash Flow**") shall be remitted to the Excess Cash Flow Reserve Account in accordance with the terms and conditions of Section 7.6 hereof.

(c)     The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(d)     All funds on deposit in the Cash Management Account following the occurrence and during the continuance of an Event of Default may be applied by Lender in such order and priority as Lender shall determine.

**2.7.3   Payments Received Under the Cash Management Agreement.** Notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, and provided no Event of Default has occurred and is continuing, upon the occurrence of a Trigger Event and prior to the occurrence of the related Release Event, Borrower's obligations with respect to the Monthly Debt Service Payment Amount and amounts due for the Tax and Insurance Escrow Fund, Replacement Reserve Fund, Rollover Reserve Fund and any other payment reserves established pursuant to this Agreement or any other Loan Document shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account established pursuant to the Cash Management Agreement to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.