# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE
REGISTERED HOLDERS OF CREDIT SUISSE FIRST
BOSTON MORTGAGE SECURITIES CORP.,
COMMERCIAL MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2005-C2, BY AND
THROUGH ITS SPECIAL SERVICER, CWCAPITAL
ASSET MANAGEMENT LLC,

                      Plaintiff,

            - against -

390 PARK AVENUE ASSOCIATES, LLC; *et al.*,

                      Defendants.

16-cv-09112 (LGS)

Oral Argument Requested

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS

Raymond Nicola Hannigan
HERRICK, FEINSTEIN LLP
Two Park Avenue,
New York, NY 10016
Tel: (212) 592-1400
Email: rhannigan@herrick.com

*Attorneys for Defendant*
  *390 Park Avenue Associates, LLC*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

RELEVANT BACKGROUND AND PROCEDURAL HISTORY ................................................ 2

ARGUMENT ........................................................................................................................ 4

I.     390 PARK HAS STATED A CLAIM THAT THE UNIQUE
STRUCTURE AND TERMS OF THE PROPERTY AND LOAN
CLOGGED THE EQUITY OF REDEMPTION .............................................................. 4

II.    390 PARK HAS STATED A CLAIM THAT PLAINTIFF FAILED TO
MITIGATE DAMAGES, SETOFF DAMAGES, AND IS BARRED
FROM CERTAIN DAMAGES BY THE DOCTRINE OF LACHES ............................. 10

     A.     Plaintiff Concedes That It Must Set Off Amounts Deposited Into
the Property's Accounts ......................................................................... 10

     B.     Plaintiff Must Set Off the Amount Paid for the Equity Pledge ............... 11

     C.     Plaintiff Is Barred From Receiving Default Interest by Its Failure to
Mitigate Its Damages and Due to Application of the Doctrine of
Laches ................................................................................................. 13

III.   390 PARK HAS STATED A CLAIM THAT PLAINTIFF BREACHED
THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING .................... 14

IV.   390 PARK HAS STATED A CLAIM THAT PLAINTIFF HAS
BREACHED FIDUCIARY DUTIES OWED TO 390 PARK ...................................... 16

V.    390 PARK HAS STATED A CLAIM THAT PLAINTIFF HAS
TORTIOUSLY INTERFERED WITH ITS ECONOMIC RELATIONS ....................... 18

VI.   390 PARK HAS STATED A CLAIM THAT IT WAS
FRAUDULENTLY INDUCED INTO EXECUTING THE LOAN .............................. 20

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*19 Recordings Ltd. v. Sony Music Entm't,*
    165 F. Supp. 3d 156 (S.D.N.Y. 2016).................................................................15

*Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,*
    731 F.2d 112 (2d Cir. 1984)...............................................................................17

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.,*
    25 N.Y.3d 1043 (2015) ......................................................................................23

*Amaranth v. JPMorgan Chase & Co.,*
    71 A.D.3d 40 (1st Dep't 2009) ..........................................................................19

*Arnon Ltd. v. Beierwaltes,*
    125 A.D.3d 453 (1st Dep't 2015) .......................................................................18

*Beecher v. Peter A. Vogt Mfg. Co.,*
    227 N.Y. 468 (1920) .........................................................................................12

*Burba v. Rochester Gas & Elec. Corp.,*
    139 A.D.2d 939, 528 N.Y.S.2d 241 (4th Dep't 1988)........................................19

*Camofi Master LDC v. College P'Ship, Inc.,*
    452 F. Supp. 2d 462 (S.D.N.Y. 2006)................................................................22

*Dayan v. York,*
    51 A.D.3d 964, 859 N.Y.S.2d 673 (2d Dep't 2008) ..........................................13

*Dickinson v. Oliver,*
    195 N.Y. 238, 246 (1909) ...................................................................................6

*Escobar v. Wells Fargo Bank, N.A.,*
    No. CV-11-285-TUC-DCB, 2011 WL 6794032 (D. Ariz. Nov. 9, 2011)............21

*Goldman v. Simon Prop. Grp., Inc.,*
    58 A.D.3d 208 (2d Dep't 2008) ........................................................................15

*Hall v. Ditson,*
    5 Abb. N. Cas. 198, 1878 WL 11185 (N.Y. Cnty. 1878) .....................................8

*Hammerstein v. Henry Mtn. Corp.,*
    11 A.D.3d 836 (3rd Dep't 2004).........................................................................5

*Hartman v. Butterfield Lumber Co.*,
    199 U.S. 335 (1905)..........................................................................................8

*IBM v. BGC Partners, Inc.*,
    No. 10-cv-128, 2010 WL 1924715 (S.D.N.Y. May 11, 2010) ...............................11

*Julien J. Studley, Inc. v. Coach, Inc.*,
    3 A.D.3d 358, 770 N.Y.S.2d 336 (1st Dep't 2004) ............................................19

*Kershaw v. Nautica S.A. Ltd.*,
    885 F. Supp. 617 (S.D.N.Y. 1995) ...................................................................21

*MacArthur v. N. Palm Beach Utilities, Inc.*,
    202 So. 2d 181 (Fla. 1967)................................................................................7

*Mandelblatt v. Devon Stores*,
    132 A.D.2d 162, 521 N.Y.S.2d 672 (1st Dep't 1987) .........................................19

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*,
    23 F. Supp. 2d 439 (S.D.N.Y. 1998).................................................................20

*Mfr. Hanover Tr. Co. v. Yanakas*,
    7 F.3d 310 (2d Cir. 1993)................................................................................16

*Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*,
    340 B.R. 1 (Bankr. E.D.N.Y. 2006)..................................................................16

*Oubre v. Entergy Ops., Inc.*,
    522 U.S. 422 (1998).........................................................................................7

*Peugh v. Davis*,
    96 U.S. 332 (1877)...........................................................................................5

*Sallee v. Fort Knox Nat'l Bank*,
    286 F.3d 878 (6th Cir. 2002) ...........................................................................21

*Scheiber v. St. John's Univ.*,
    84 N.Y.2d 120 (1994) .................................................................................18, 19

*Second Lenox Terrace Assoc. v. Cuevas*,
    No. 250670/2005, 2009 WL 2033029 (N.Y. Civ. Ct., Jul. 9, 2009).......................8

*Trustees of Local 813 Ins. Trust Fund v. Wilners Livery Serv. Inc.*,
    No. 11-cv-3180, 2012 WL 4327070 (E.D.N.Y. Sept. 19, 2012) ...........................8

*Wall v. CSX Transp., Inc.*,
    471 F.3d 410 (2d Cir. 2006).............................................................................22

*Westinghouse Credit Corp v. D'Urso*,
    278 F.3d 138 (2d Cir. 2002)..................................................................11

*Yagamo Acquisitions, LLC v. Baco Dev. 102 St. Inc.*,
    278 A.D.2d 134, 718 N.Y.S.2d 325 (1st Dep't 2000) ...........................13

**STATUTES AND RULES**

Fed. R. Civ. Proc. 8 .................................................................................19

N.Y. RPAPL §1352 ....................................................................................6

**OTHER AUTHORITIES**

20 Am. Jur. 2d Counterclaim, Recoupment, Etc. §53 ...............................12

1-2 Bergman on New York Mortgage Foreclosures §2.20 (2017) ...............13

Edgar N. Durgee, *The Lien or Equitable Theory of the Mortgage — Some
    Generalizations*, 10 Mich. L. Rev. 587 (1912) .......................................5

Howard Kane, *The Prohibition Against Clogging the Equity of Redemption: Recent
    Developments*, ACREL Conference Finance Topics (April 4, 1997).............6, 7, 9

John C. Murray, *Clogging Revisited*,
    33(2) Real Property, Probate and Trust Journal 279 (1998) ......................6

Pomeroy's Equity Jurisprudence and Equitable Remedies (5th ed. 1941) ...........5

3 New York Real Property Service §33:8 (2008 Cumulative Supplement) ...............6

Todd Soloway & Stephanie Kline, *Loan Structuring and the Equity of Redemption*,
    250 N.Y.L.J. 85 (Oct. 30, 2013) ...........................................................6

Bruce Wyman, *The Clog on the Equity of Redemption*,
    21 Harvard L. Rev. 459 (1908) .............................................................5

## PRELIMINARY STATEMENT[1]

Plaintiff has filed a motion to dismiss the counterclaims pled by 390 Park Avenue Associates, LLC ("390 Park") in an attempt to avoid discovery. Indeed, Plaintiffs have taken the novel and meritless position that, because of their motion, discovery is now bifurcated and Plaintiff may refuse to produce records relating to 390 Park's counterclaims (while agreeing to produce records to further its own foreclosure claims). However, Plaintiffs have not moved to strike 390 Park's affirmative defenses, which are similar though not entirely co-extensive with each of the counterclaims, rendering Plaintiffs' position even more bizarre.

Notwithstanding these procedural games, 390 Park's counterclaims adequately state counterclaims. Plaintiff opts to give only the most cursory overview of each counterclaim in an attempt to downplay the issues and distract from the fact that Plaintiff misconstrues and mischaracterizes the factual bases and legal theories advanced in the counterclaims. For example, as set forth more fully below, 390 Park adequately alleges that Plaintiff's purported predecessor in interest, Column Financial, Inc. ("Column") came up with a dual loan structure that took into account the unique characteristics of this Property – with a mortgage not on the land or building itself but on the leasehold interests in a Ground Lease, itself with a commercially impracticable rent reset set to come into effect in 2020, and an Equity Pledge on the equity interests in the Borrower entity – and attempted to clog the equity of redemption, thwarting the borrower's ability to redeem the property in the event of a default in contravention of centuries old New York public policy, and, all the while, offload any risk to itself by dumping the loan into a commercial mortgage-backed securities trust.

---

[1] Unless stated otherwise in this brief, defined terms have the meaning set forth in the Amended Answer. Dkt. No. 61. References to "Compl." are to the complaint (Dkt. No. 1) and references to "Brief" or "Br." are to Plaintiff's motion to dismiss the counterclaims. Dkt. No. 64.

Similarly, 390 Park adequately states counterclaims for setoff on the basis of this wrongful clog on the equity, which forced 390 Park's affiliate to purchase the Equity Pledge at a price above the par value of the loan to try and protect 390 Park's equity of redemption. Finally, 390 Park's other counterclaims – for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, tortious interference, and fraudulent inducement – each allege wrongful conduct more than sufficient at this motion to dismiss stage to both plead the right to recover under those counterclaims and to provide Plaintiff with sufficient detail to understand the contours of those claims under federal notice pleading standards. Discovery is necessary to reveal additional details and, of course, Plaintiff is the party in possession of that discovery and seeks to use this motion as a shield to prevent 390 Park from uncovering any additional support for its counterclaims. Therefore, for these reasons and those set forth more fully below, Plaintiff's motion to dismiss the counterclaims should be denied.

## RELEVANT BACKGROUND AND PROCEDURAL HISTORY

A more complete recitation of the facts of this case are discussed in the Amended Answer, and 390 Park's briefing on the original motion to dismiss the complaint. Dkt. Nos. 29, 45. Nonetheless, a brief summary of relevant facts and procedural history of this action is recounted here for the Court's benefit.

This litigation involves a loan and mortgage not on the fee interest in the Property, but on 390 Park's interests in a leasehold estate created pursuant to a Ground Lease. Amended Answer ¶¶21-22; Compl. Exs. A-C. Under the Ground Lease, 390 Park is granted possessory rights in the Property and operates the Property as a commercial office building. Amended Answer ¶20. The Ground Lease contains a commercially impracticable rent reset provision that will dramatically increase the rent owed to the Landlord under the Ground Lease when it is triggered in 2020. Amended Answer ¶¶105, 110, 116-17. Even if it is fully subleased by 390

Park (or Plaintiff or any other purchaser at foreclosure), the amounts paid by the commercial tenants at the building likely will be insufficient to meet the increased rent due, and the Ground Lease — the collateral securing the Loan — may be terminated by the Landlord under the Ground Lease upon any default caused by the likely rent shortfall. *Id.* As such, the rent reset creates a significant challenge, if not impossibility, for anyone operating the property or attempting to obtain financing or refinancing involving the leasehold interests secured by the Mortgage. *Id.* Because of these complications, it is necessary to view the dispute at issue, and the defenses and counterclaims, in this context, because that context is key to the rationality, or irrationality, of the parties' behavior — and provides circumstantial evidence of bad faith in support of several of 390 Park's counterclaims.

390 Park filed its original answer in this action, asserting five affirmative defenses, on July 5, 2017. Dkt. No. 59. Pursuant to the scheduling order in this action (Dkt. No. 58), 390 Park timely filed its Amended Answer on July 28, 2017 asserting eight additional affirmative defenses, five of which were also plead as counterclaims. Dkt. No. 61. On August 18, 2017, rather than answer, Plaintiff moved to dismiss only the five counterclaims (and has not moved to dismiss or strike any of the affirmative defenses that are similar, although not identical, to those counterclaims relying on the same factual allegations pled in the answer). Dkt. No. 64. The fact that Plaintiff has chosen this procedural approach — to attempt to dismiss some counterclaims but not to strike any of the affirmative defenses — only serves to highlight the improper and contradictory positions taken by Plaintiff in discovery in this action.

**ARGUMENT**

**I.    390 PARK HAS STATED A CLAIM THAT THE UNIQUE
       STRUCTURE AND TERMS OF THE PROPERTY AND LOAN
       CLOGGED THE EQUITY OF REDEMPTION**

Plaintiff seeks dismissal of 390 Park's counterclaim seeking, *inter alia*, a declaratory judgment that the mortgage loan, as structured, is invalid and unenforceable for improperly clogging the borrower's equity of redemption.   While Plaintiff makes a number of feeble challenges, the main thrust of Plaintiff's argument is summed up in its statement that purportedly there "has not been reported a New York case finding a clog in the equitable right of redemption in more than 125 years."  Br. at 4.

In making this wholly rhetorical argument, Plaintiff utterly ignores (and in fact underlines) that there has not been *a single* reported decision addressing the factual circumstances here, where, among other things, the *same* lender: (i) took a mortgage on the Ground Lease *simultaneously* with a loan collateralized by a pledge in the borrower's equity (the "Equity Pledge"); (ii) married the transactions in the loan documents, and for each loan, made any default under one loan a cross-default under the other; and (iii) incredibly granted to itself the ability effectively to shift, at will, the outstanding principal balances, interest rates, and order of payment priority between the mortgage loan and the Equity Pledge, thus making clear that these purportedly "two" separate loans are, in reality, *one* combined loan, containing a built-in mechanism to strip, thwart and/or fetter the borrower's clear rights to defend a foreclosure and ultimately to redeem the property.

The question presented is simple — whether or not, under these facts and circumstances, the mortgage at issue was structured so as to clog the equity of redemption and is therefore void *ab initio*, as contracts that are contrary to public policy are repeatedly found to be.  This requires a fact intensive inquiry that is improper for resolution at the motion to dismiss stage.

First, there can be no dispute that the prohibition on clogging the equity of redemption is a deeply entrenched, public policy infused in all mortgage transactions. The equity of redemption is the right to redeem an entire property upon the tender of the amount due on a loan — it is a right that cannot be waived or abandoned. *See Hammerstein v. Henry Mtn. Corp.*, 11 A.D.3d 836, 838 (3rd Dep't 2004); *see also Peugh v. Davis*, 96 U.S. 332, 336 (1877). A clog or restraint on the equity of redemption is a corollary doctrine, and prohibits any provision or improper structuring of a mortgage to prevent a redemption on payment or performance of the debt or obligation for which the security was given. Bruce Wyman, *The Clog on the Equity of Redemption*, 21 Harvard L. Rev. 459, 472 (1908) [hereinafter "Wyman"].

The longstanding prohibition on clogging the equity of redemption is essentially as old as the doctrine of the "equity of redemption" itself. The equity of redemption dates back to at least the early seventeenth century. *Id.* at 459. It should come as no surprise that ever since the establishment of the equity of redemption, clever lenders, "with an eye to the ultimate acquisition of the mortgaged estate," have sought ways to evade it, and in such instances, impermissible clogs on the equity of redemption have been dismissed. *Id.* at 460.

> ***[A]greements, however explicit, which clogged the equity of redemption were void***. The true justification of this equitable innovation lies in the fact that lender and borrower are not usually on an equal footing and that the latter needs protection against the former.

Edgar N. Durgee, *The Lien or Equitable Theory of the Mortgage — Some Generalizations*, Mich. L. Rev. 10, 587 & 601 n.41 (1912).[2]

---

[2]     Moreover, as Pomeroy provides: "[T]he right of redemption is the very essential element of the equitable conception of a mortgage. ***If an instrument is once a mortgage, nothing, in general, can destroy the equitable right of redemption***. . ." Pomeroy's Equity Jurisprudence and Equitable Remedies at §1219 (5th ed. 1941) (emphasis added).

In New York the equity of redemption is a *statutory* right and may not be interfered with by the lender's taking an equity interest in the property. *See* 3 New York Real Property Service §33:8 (2008 Cumulative Supplement); N.Y. RPAPL §1352. In New York, the right of a mortgagor to redeem the mortgaged property is considered to be an essential and inseparable part of the mortgage. *See Dickinson v. Oliver*, 195 N.Y. 238, 246 (1909). It is for this reason that in New York (and elsewhere), clogs on the equity of redemption are unenforceable. Todd Soloway & Stephanie Kline, *Loan Structuring and the Equity of Redemption*, 250 N.Y.L.J. 85 (Oct. 30, 2013) [hereinafter "Soloway"].

*Second*, modern discussions addressing the prohibition on clogging on the equity of redemption not only demonstrate the absolute persistence of this central precept of public policy, but also cast substantial doubt on exactly the type of split-loan transaction at the heart of this litigation. Indeed, the prohibition against clogging the equity of redemption has significant implications for new forms of financing, including mezzanine loans. *See* Howard Kane, *The Prohibition Against Clogging the Equity of Redemption: Recent Developments* at 1, ACREL Conference Finance Topics (April 4, 1997) [hereinafter "Kane"].[3]

> On securitized financings and other loan transactions, the mortgagee frequently obtains from the persons or entities which own the borrowing entity a pledge of the ownership interest in the borrower … This pledge would typically be governed by the Uniform Commercial Code, with the right to hold a public sale of the collateral upon default. *This pledge, however, may be vulnerable to a challenge as a clog on the equity of redemption*.

*Id.* at 17 (emphasis added); *see also* Soloway ("Clogging can occur in a number of ways. … Another example is where the lender, at the time the loan is made, obtains via a provision in the

---

[3]    *See also* John C. Murray, *Clogging Revisited*, 33(2) Real Property, Probate and Trust Journal 279 (1998) (discussing mezzanine financing and the implications, depending on loan structure, for clogging the equity of redemption).

documents an option to purchase or convert the loan to equity.  In both of these instances, the lender will likely be found to have clogged the borrower's equity of redemption….").

Commentators, drawing from substantial case law cited in his lengthy presentation, have explained that a fact-based, transaction-centered inquiry should be undertaken to analyze whether a loan structure is tainted by "clogging" concerns including whether:  (i) the mezzanine loan represents an interest in addition to the mortgage loan for which the parties have negotiated; (ii) the structure of the loan would prevent redemption; (iii) the mezzanine financing is really part of the first mortgage; (iv) the mezzanine financing is linked to the first by default, reporting or other requirements; (iii) the lenders are the same or different; and (iv) the presence of any separate consideration.  Kane at 18; *see also MacArthur v. N. Palm Beach Utilities, Inc*., 202 So. 2d 181, 188 (Fla. 1967) (although in that instance finding an option was separate from a mortgage, demonstrating that a court should scrutinize the structure and purpose of the transaction in issue).  Furthermore, "if the mezzanine lender obtains remedies in the mezzanine investment documents which would benefit the first mortgage, such as the right to control operations of the borrowing entity, the lender may have obtained rights through the mezzanine loan which constitute a clog on the equity of redemption."  Kane at 19.

Thus, when a court is faced with a transaction structure that is potentially abhorrent to settled public policy prohibiting a clog in the equity of redemption, it should undertake a factual investigation to determine whether the structure at issue was unfair, unconscionable, could be construed in the nature of a penalty clog, or would be inconsistent with, or repugnant to, the equitable right of redemption.

*Third*, it is beyond cavil that contracts abhorrent to public policy are not merely voidable, but instead are *void — i.e.* void *ab initio*.  *See Oubre v. Entergy Ops., Inc.,* 522 U.S. 422 (1998)

(explaining that the hallmark of a void contract is that it violates law or public policy); *Hartman v. Butterfield Lumber Co.,* 199 U.S. 335, 341 (1905) (explaining that contracts that are contrary to public policy are illegal and void, not merely voidable); *Trustees of Local 813 Ins. Trust Fund v. Wilners Livery Serv. Inc.*, No. 11-cv-3180, 2012 WL 4327070 (E.D.N.Y. Sept. 19, 2012) ("[C]ourts have held that an agreement that violates public policy would, in fact, render the agreement void, and not merely voidable.") (collecting cases); *Second Lenoxs Terrace Assoc. v. Cuevas*, No. 250670/2005, 2009 WL 2033029 (N.Y. Civ. Ct., Jul. 9, 2009) (contract contravening law is void as contrary to public policy, not merely voidable).

*Fourth*, contrary to Plaintiff's position, 390 Park was not required first to proffer a redemption in order to pursue its claim for clogging the equity of redemption — a claim in which it seeks a declaration against Plaintiff invalidating the Mortgage as void, and damages for steps undertaken to protect rights that should have been inherent in, but were instead jettisoned in the Mortgage allegedly assigned to Plaintiff in this action. The case cited by Plaintiff, *Hall v. Ditson*, 5 Abb. N. Cas. 198, 211-12, 1878 WL 11185 (N.Y. Cnty. 1878), does not, as Plaintiff suggests, hold otherwise. Nor is 390 Park aware of a single case setting forth such an element as a pre-requisite to a claim. *Hall* was an action to redeem (as opposed to an action, as here, seeking to void a contract that clogs the equity of redemption). *Hall* in fact supports 390 Park's position that courts should examine the transaction, independently, to scrutinize whether its structure amounts to an improper clog. *Id.* at 207 (reviewing the structure of the dueling arrangements at issue in the case to determine whether "they were truly part and parcel of one general arrangement").

Here, 390 Park has stated a cause of action in seeking declaratory judgment that the mortgage loan, as structured, is invalid and unenforceable for improperly clogging the

borrower's equity of redemption. There has not been a single reported decision addressing the unique and compelling factual circumstances here where, among other things: (i) the same lender; (ii) took a mortgage simultaneously with a loan collateralized by a pledge in the borrower's equity (the Equity Pledge); (iii) made any default under one loan a cross-default under the other, thus inextricably linking the loans; and (iv) the mortgage incredibly granted to the lender the ability effectively to shift, at will, the outstanding principal balances, interest rates, and order of payment priority between the mortgage loan and the Equity Pledge. *See* Kane at 18 (to avoid consideration as a clog on the equity of redemption, "a. the holder of the mezzanine interest should be a separate party from the holder of the first mortgage; b. separate consideration is provided in the form of the additional investment."; "it is clearly advisable to endeavor to document the transaction separately and to have two different lending entities").

390 Park has pled sufficient facts to overcome a motion to dismiss, and should be allowed to garner additional evidence to prove that these purported "two" loans were, in reality, a single mortgage, containing a built-in mechanism to strip, thwart and/or fetter the borrower's equity of redemption, and are therefore void as contrary to public policy. Amended Answer ¶¶58-64. Indeed, there are indicia of improper intent and structuring throughout the documents and history as understood to date. Setting aside the foregoing facts, which are alone sufficient to find a clog on the equity of redemption, the loan documents additionally purport to grant the lender a right to sell "rights of redemption." Amended Answer ¶64. Moreover, discovery to date has already shown that the term sheet for the mortgage in the first instance contemplated a single mortgage alone; however, thereafter that single loan was restructured to become the simultaneously executed dual loan contracts. Specifically, the final term sheet was for a $120 million loan, with the potential to split that amount into first lien and mezzanine financing —

which is precisely what happened here, splitting the single mortgage into a mortgage loan for $110 million and an Equity Pledge for $10 million — rendering the notion that they are two separate loans, bound by separate consideration, a true façade.

## II. 390 PARK HAS STATED A CLAIM THAT PLAINTIFF FAILED TO MITIGATE DAMAGES, SETOFF DAMAGES, AND IS BARRED FROM CERTAIN DAMAGES BY THE DOCTRINE OF LACHES

390 Park has pled several related but independent bases for why certain of Plaintiff's purported damages claims should be either reduced or barred, including (i) that all amounts collected in the Property's accounts must be set-off against the outstanding amount (Amended Answer ¶75); (ii) the clog on the equity of redemption caused 390 Park's affiliate to incur substantial cost to purchase the Equity Pledge (at a price above par) to protect itself, which amounts must be set-off against the outstanding amount (*id.* ¶76); and (iii) the long delay in seeking foreclosure has contributed to the untimely and improper accumulation of significant amounts of default interest, which constitutes both a failure to mitigate damages and amounts that are barred by the application of the doctrine of laches (*id.* ¶77). In seeking dismissal of these claims, Plaintiff fundamentally misunderstands the nature and contours of 390 Park's claims, and, for the reasons set forth below, its arguments therefore miss the mark.

### A. Plaintiff Concedes That It Must Set Off Amounts Deposited Into the Property's Accounts

Plaintiff concedes that it must set off any amounts deposited into the Property's accounts. Br. at 6. Plaintiff bases this concession on the definition of "Debt" in its complaint, which is the outstanding amount "less certain amounts held in suspense, reserve or escrow accounts." *Id.* That reduction is certainly part of what 390 Park is entitled to set off, but 390 Park's counterclaim is not limited to simply what is in those accounts — it includes all amounts deposited in any of the Property's accounts, including any amounts withdrawn or swept by the

Lender. 390 Park is entitled to explore those issues through discovery on both its counterclaim and its affirmative defense, which is not subject to this motion.

B.     <u>Plaintiff Must Set Off the Amount Paid for the Equity Pledge</u>

Like 390 Park's claims regarding the clogging of the equity of redemption, the right to set off the amounts paid to acquire the Equity Pledge to attempt to protect its equity of redemption — paying over the par value of that Equity Pledge in order to do so — is both a counterclaim and an affirmative defense. As a preliminary matter, that there may be overlap between 390 Park's defenses and its counterclaims is not a reason to dismiss the counterclaims at the pleading stage. This is particularly pertinent given Plaintiff's implication that the amount paid for the Equity Pledge cannot be a set-off or an affirmative defense under the Loan Documents even if 390 Park was entitled to it; therefore, at this procedural posture, the defense must remain as a counterclaim as well. *See* Br. at 7 (quoting Loan §8.2); *see also IBM v. BGC Partners, Inc.*, No. 10-cv-128, 2010 WL 1924715, at *3 (S.D.N.Y. May 11, 2010) ("IBM argues that because BGC's declaratory judgment counterclaim mirrors its affirmative defenses and IMB's [sic] claims it must be dismissed. Simply because a declaratory judgment claim overlaps with other claims or defenses is not, however, a sufficient reason to dismiss the claim at the pleading stage.").

Moreover, Plaintiff's claim — that there can be no set-off where there is not perfect mutuality between the debts owed between the Trust and 390 Park and its affiliates — ignores the relevant law and the equitable nature of Defendant's counterclaim. While Plaintiff is correct that generally "setoff requires mutuality" (Br. at 7 (citing *Westinghouse Credit Corp v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002)), mutuality exists here where 390 Park's affiliate was effectively acting as an agent to acquire the Equity Pledge for 390 Park's benefit because, as Plaintiff well knows, 390 Park is and is required to be a Special Purpose Entity under the Loan Documents and could not itself acquire the Equity Pledge.

Plaintiff ignores that fact, as well as other limitations upon the mutuality requirement. While New York courts have not addressed the question directly, it is hornbook law that mutuality may be satisfied — in either direction — with respect to a counterclaim brought by another "real party" in interest. *See* 20 Am. Jur. 2d Counterclaim, Recoupment, Etc. §53 ("While a debt or demand in favor of or against a third person not a party to the action normally cannot be pleaded or allowed as a counterclaim or setoff, courts have equitable authority to allow a setoff against the real party in interest to a demand, although the real party is not a nominal party … Note, setoff can be made only against the real party in interest, and a court will look through the transactions and nominal parties to determine who are the real parties in interest"); *cf. Beecher v. Peter A. Vogt Mfg. Co.*, 227 N.Y. 468, 473 (1920) ("setting off one judgment against another is granted, not of right, but in the exercise of discretion" and, although "[d]ebts, to be applied against each other, must be mutual," equity sometimes "relaxes these rules, and goes beyond the law … [if] necessary to prevent wrong and injustice").

Here, while Borrower's affiliates may have nominally acquired the Equity Pledge, the Second Counterclaim pleads that 390 Park's affiliates had to step in to "attempt to protect its right to redeem the Property." Amended Answer ¶76. If 390 Park is not allowed to make a claim for setoff as a matter of law, injustice will follow. Even if mutuality is not perfect, this Court ought to examine the facts related to the structure of the Property and Loan Documents and the purchase of the Equity Pledge, and find that justice is not served by barring setoff because of a coincidence of corporate structures and the requirements placed on 390 Park by the very Loan Documents under which Plaintiff seeks to recover.

C.   Plaintiff Is Barred From Receiving Default Interest by Its Failure to Mitigate Its
     Damages and Due to Application of the Doctrine of Laches

Plaintiff claims that a failure to mitigate damages does not apply to an action to foreclose

a mortgage and that laches does not apply if the foreclosure action is brought within the

limitations period.   But Plaintiff misconstrues 390 Park's allegations.   Both the mitigation of

damages claim and the laches claim are only related to the improper accumulation of default

interest, not the foreclosure cause of action itself.   Nothing prevents 390 Park from attacking the

accumulation of default interest caused by the undue delay, and that the Loan Documents

provide Plaintiff with the ability to make certain choices with respect to a defaulted mortgage

does not eliminate either a failure to mitigate or laches defense.   Indeed, it is well-settled that

Plaintiff may be denied such default interest for the period of its undue delay.   *See* 1-2 Bergman

on New York Mortgage Foreclosures § 2.20 (2017) (collecting cases, and stating that "[c]ase law

stands firmly for the proposition that interest may be denied for a period of undue delay"); *see*

*also Dayan v. York*, 51 A.D.3d 964, 965, 859 N.Y.S.2d 673, 675 (2d Dep't 2008) ("it would be

unconscionable to charge Joseph York with accrued interest and penalties for the plaintiff's

delay in completing the foreclosure action"); *Yagamo Acquisitions, LLC v. Baco Dev. 102 St.*

*Inc.*, 278 A.D.2d 134, 134, 718 N.Y.S.2d 325, 326 (1st Dep't 2000) ("it would, under the

unusual circumstances presented in this foreclosure action, be unconscionable to hold defendants

responsible for plaintiff's lengthy delay in obtaining the judgment of foreclosure and sale.").[4]

---

[4]      Although this portion of 390 Park's affirmative defense and counterclaim is addressed in
Plaintiff's motion, and so is responded to here, 390 Park notes that Plaintiff's argument about
laches and failure to mitigate specifically regarding the default interest is directed primarily to
the <u>affirmative defense</u> asserted in the amended answer – which is not subject to this motion –
rather than the counterclaim.

**III.     390 PARK HAS STATED A CLAIM THAT PLAINTIFF BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Plaintiff claims that 390 Park has not "alleged a single fact" or "identified any action" that was contrary to the Loan Documents in support of 390 Park's claim for breach of the implied covenant of good faith and fair dealing. Br. 8, 9. The only problem with this statement is that even Plaintiff goes on to list the facts and actions that were expressly pled and underpinned 390 Park's claim of a breach of the implied covenant. *See id.* at 9. 390 Park specifically pled that Plaintiff's conduct, including regarding an appraisal (that Plaintiff has claimed is privileged during the discovery disputes in this case, rather than that one does not exist), various communications with the bondholders and the landlord under the Ground Lease, taken either individually or together supported 390 Park's claim that Plaintiff's exercise of discretionary rights under the Loan Documents were not done in good faith and therefore breach the implied covenant. *See* Amended Answer ¶¶98-101. 390 Park pled that the numerous actions identified in the answer made "no sense other than in the context of Plaintiff's single minded desire to control the Property" (id. at ¶98) and were all "part and parcel of Plaintiff's disregard for its duty to act in good faith and deal fairly with 390 Park." *Id.* at ¶101. In this context, Plaintiff is really arguing, then, about not only the veracity of the allegations, but also the import of each of those facts, which is inappropriate for resolution on a motion to dismiss.

It also makes little difference that some of those facts are related to issues involving other interested parties, such as the bondholders or the landlord under the Ground Lease. Plaintiff's claim that "Borrower lacks standing to assert any such claims on behalf of these third parties" misses the point (Br. at 9); 390 Park is not asserting any claims on behalf of these entities, it is asserting facts that contribute to a conclusion that, all things considered, Plaintiff was not acting in good faith and breached the implied covenant of good faith and fair dealing. Plaintiff's claim

that 390 Park may not rely on duties owed to other parties ignores that 390 Park may cite such facts as circumstantial support for a lack of good faith. Indeed, even the counterclaim expressly pleads that the harm caused by this breach was not to these third parties, but to 390 Park, including "the inability to attract new subtenants to the Property," and causing "subtenants [to] leav[e] the Property (or imminently leav[e] the Property) due to the uncertainty introduced by Plaintiff's wrongful conduct." Amended Answer ¶101.

Plaintiff's cases also do not counsel in favor of dismissal, and merely raise the uncontroversial principle that, generally speaking, "the implied covenant of good faith and fair dealing cannot create duties that are contrary to the terms of the agreement." Br. at 9. Of course, if the covenant could not create duties "beyond what is contained" in the express terms of contract, it would have no application at all; the entire purpose of the covenant is "to seek imposition of an entirely proper duty to eschew bad-faith targeted malevolence in the guise of business dealings." *19 Recordings Ltd. v. Sony Music Entm't*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016).

Contrary to Plaintiff's claim, its actions need not be expressly "contrary to the Loan Documents," in order to be wrongful because Plaintiff and its agents "were required to exercise any discretionary rights" in good faith. Amended Answer ¶97. Because every contract includes an implied covenant of good faith and fair dealing, failing to exercise discretionary rights in good faith **is** itself "contrary to the Loan Documents." *See Goldman v. Simon Prop. Grp., Inc.*, 58 A.D.3d 208, 219 (2d Dep't 2008) (holding that plaintiff stated a cause of action for a breach of the implied covenant because "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion"). Here, as alleged, Plaintiff's exercise of its discretion regarding the foreclosure action makes little

to no economic sense given the unique nature of the Property, the Loan Documents, and the commercially impracticable rent reset contained in the Ground Lease.  Plaintiff is merely arguing over the import of all the facts pled by 390 Park and how they fit into the complex arrangements at the Property and between multiple interested parties.  Because all well-pleaded allegations are treated as true at this procedural stage, the motion to dismiss must be denied on that basis alone, notwithstanding the other reasons discussed above.

## IV.  390 PARK HAS STATED A CLAIM THAT PLAINTIFF HAS BREACHED FIDUCIARY DUTIES OWED TO 390 PARK

390 Park pled that the particular structures of Plaintiff's relationship with 390 Park — in particular the specific structure of control of the lockbox account and the unique position of control over 390 Park that the unique and complex structure at the Property granted to Plaintiff — created the sort of "relationship of confidence, trust, or superior knowledge or control" in which New York law finds a fiduciary relationship notwithstanding the general rule that fiduciary duties are not automatically imposed in a debtor-creditor relationship.  *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*, 340 B.R. 1, 41 (Bankr. E.D.N.Y. 2006); *see also Mfr. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993) (a "fiduciary relationship may arise … if there is either a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding … or an assumption of control and responsibility").

Plaintiff argues that the "existence of a lockbox" and "exercising rights in a lockbox" do not create a fiduciary duty.  Br. at 9.  But the mere existence of the lockbox is not the basis upon which 390 Park alleges that a fiduciary duty arose.  Plaintiff's single-minded focus on the "existence of a lockbox" and "lender exercising rights" in that lockbox ignores the complicated structure described in the Amended Answer and the dramatic increase in Plaintiff's control over the Property's accounts after a default caused by a confluence of factors including, "a Mortgage

on the interests in the Ground Lease (rather than the Property)," "a commercially impracticable rent reset contained in that Ground Lease," Plaintiff having "the sole capability to provide the financing in any potential workout or refinancing of the Loan," and "Plaintiff's level of control over the Property's income and accounts" through the lockbox after a default —that result in "the addition of a relationship of confidence, trust, or superior knowledge or control," and create a fiduciary duty.  Answer at ¶¶ 104-107.

390 Park is not aware of any case that has addressed facts similar to those alleged here. However, taking the allegations as true, the Amended Answer pleads that the specific structure at issue at this Property dramatically increases Plaintiff's control over the Property's accounts after a default and subjects one party entirely to the whims of the other — including one whose conduct demonstrates a "single minded desire to control the Property."  Those facts state a scenario in which Plaintiff's degree of control changed and the specific and unique structure at this Property and between these parties imposes certain fiduciary obligations.  Plaintiff merely mischaracterizes 390 Park's argument to suggest this case is just about the mere existence of a lockbox arrangement and fails to actually address the complicated arrangements at the Property that actually underpin 390 Park's claim.

Plaintiff's citation of *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 122 (2d Cir. 1984), does not support the proposition that a lockbox arrangement cannot form the basis for the imposition of fiduciary obligations, as 390 Park has alleged.  In *Aaron Ferer & Sons*, the argument that a fiduciary relationship existed was based upon the fact that "Chase (1) was banker for both Ferer-Omaha and Ferer-London; (2) had access to the financial records of both corporations; and (3) knew that the two corporations had a close relationship." *Id.*  The exercise of rights in the lockbox in that case was the *breach* at issue, not what created

17

on the interests in the Ground Lease (rather than the Property)," "a commercially impracticable rent reset contained in that Ground Lease," Plaintiff having "the sole capability to provide the financing in any potential workout or refinancing of the Loan," and "Plaintiff's level of control over the Property's income and accounts" through the lockbox after a default —that result in "the addition of a relationship of confidence, trust, or superior knowledge or control," and create a fiduciary duty.  Answer at ¶¶ 104-107.

390 Park is not aware of any case that has addressed facts similar to those alleged here. However, taking the allegations as true, the Amended Answer pleads that the specific structure at issue at this Property dramatically increases Plaintiff's control over the Property's accounts after a default and subjects one party entirely to the whims of the other — including one whose conduct demonstrates a "single minded desire to control the Property."  Those facts state a scenario in which Plaintiff's degree of control changed and the specific and unique structure at this Property and between these parties imposes certain fiduciary obligations.  Plaintiff merely mischaracterizes 390 Park's argument to suggest this case is just about the mere existence of a lockbox arrangement and fails to actually address the complicated arrangements at the Property that actually underpin 390 Park's claim.

Plaintiff's citation of *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 122 (2d Cir. 1984), does not support the proposition that a lockbox arrangement cannot form the basis for the imposition of fiduciary obligations, as 390 Park has alleged.  In *Aaron Ferer & Sons*, the argument that a fiduciary relationship existed was based upon the fact that "Chase (1) was banker for both Ferer-Omaha and Ferer-London; (2) had access to the financial records of both corporations; and (3) knew that the two corporations had a close relationship." *Id.*  The exercise of rights in the lockbox in that case was the *breach* at issue, not what created

the duty. It has no bearing on whether the dramatic increase in control in this case, coupled with the complicated arrangements at the Property, could create a fiduciary obligation in this context.

## V.  390 PARK HAS STATED A CLAIM THAT PLAINTIFF HAS TORTIOUSLY INTERFERED WITH ITS ECONOMIC RELATIONS

Plaintiff attacks 390 Park's counterclaim for tortious interference by claiming (i) that "wrongful conduct" can never consist of "exercising a right specifically contemplated by a contract" and (ii) that 390 Park does not allege that, but-for the interference, "an actual contract with Landlord would have resulted." Neither of these arguments have merit.

First, Plaintiff confuses an "or" for an "and" in the elements of tortious interference, and misunderstands the nature of the "wrongful" conduct in any event. Even the cases cited by Plaintiff for the elements of tortious interference makes clear that the Borrower must allege that the interference was "accomplished by "wrongful means **or** with malicious intent." *Arnon Ltd. v. Beierwaltes*, 125 A.D.3d 453, 453-54 (1st Dep't 2015) (emphasis added). 390 Park pled that Plaintiff initiated the foreclosure action "for the sole purpose of inflicting harm to 390 Park's existing relationship with the landlord under the Ground Lease." Amended Answer ¶111. Thus, 390 Park pled that Plaintiff acted with malicious intent, regardless of the means (i.e. the foreclosure action), and Plaintiff does not address that issue in its briefing.

Plaintiff also misunderstands the nature of "wrongful means." While it may be true that, ordinarily, "exercising a right specifically contemplated by a contract" is not wrongful, it is not difficult to imagine a circumstances in which it becomes wrongful — for example, by exercising discretion irrationally and arbitrarily as described above regarding the breach of implied covenant of good faith and fair dealing. Although Plaintiff has the right to initiate foreclosure proceedings, if it did so for "the sole purpose of inflicting harm," as 390 Park plead, because it was otherwise economically irrational, its means could nonetheless be wrongful. *Cf. Scheiber v.*

*St. John's Univ.*, 84 N.Y.2d 120, 127 (1994) (finding, despite contract giving school the right to engage in preferential hiring on the basis of religion, that a triable issue of fact existed on whether the school had engaged in forbidden religious discrimination).

Second, 390 Park has adequately pled that Plaintiff's action caused the interference with a potential contract with Landlord. Plaintiff's claim that there was no allegation that "an actual contract would have resulted" in the absence of Plaintiff's conduct elevates form over substance. 390 Park alleged it was negotiating the terms of the Ground Lease and Plaintiff prevented those negotiations from concluding. Amended Answer ¶¶110-112. The obvious conclusion of those negotiations is the amendment of, or a new, Ground Lease, and the allegations are certainly sufficient under the federal notice pleading standard. *See* FRCP 8; *see Amaranth v. JPMorgan Chase & Co.*, 71 A.D.3d 40, 48 (1st Dep't 2009) (holding that where plaintiffs "have alleged a specific business relationship – the prospective deal between the Fund and Citadel – that has been harmed" and "do[] not rely merely on generalized reputational harm, we find that it sounds in tortious interference"); *Julien J. Studley, Inc. v. Coach, Inc.*, 3 A.D.3d 358, 359, 770 N.Y.S.2d 336, 338 (1st Dep't 2004) ("a plaintiff need not allege that it would have closed on the same or a substantially similar contract to that ultimately made with the prospect"); *Burba v. Rochester Gas & Elec. Corp.*, 139 A.D.2d 939, 940, 528 N.Y.S.2d 241, 243 (4th Dep't 1988) ("Interference with a plaintiff's business relations with a third party can be found if the plaintiff had a 'reasonable expectancy of a contract' with the third party, which can result from mere negotiations"); *Mandelblatt v. Devon Stores*, 132 A.D.2d 162, 169, 521 N.Y.S.2d 672, 677 (1st Dep't 1987) ("counterclaim appellants state that the prospective buyers would likely have purchased Devon but for respondent's conduct and the allegations in the Slovin affidavit are sufficient, at this stage, to sustain the pleading.") (citations omitted).

New York law does not require the use of specific magic words and phrases like "but for" and "actual contract." Plaintiff clearly knows the contours of the defense, and that is sufficient under the federal rules. *See* FRCP 8. 390 Park has pleaded that Plaintiff's wrongful interference in the negotiations towards a resolution of the commercially impracticable rent reset. Amended Answer ¶110. 390 Park was not negotiating just for the pure joy of it; 390 Park was trying to get a new or amended Ground Lease with the Landlord.

## VI.  390 PARK HAS STATED A CLAIM THAT IT WAS FRAUDULENTLY INDUCED INTO EXECUTING THE LOAN

Plaintiff's arguments regarding 390 Park's fraud defense also fail for several reasons. First, the statute of limitations was equitably tolled by the Original Lender's conduct. *See* Br. at 11; *but see Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 447 (S.D.N.Y. 1998) (holding that the statute of limitations was tolled due to a party's fraudulent concealment of key facts, reasoning that "the statute of limitations would not begin to run until the defendants acquired actual knowledge or should have acquired actual knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to be put on notice"). Plaintiff may well argue that 390 Park should have known earlier, but that is quintessentially a question of fact. And discovery is necessary to establish what the amended answer pleads – that Original Lender knew all along, and concealed, the issues created by the unique structure at the Property and the terms of the Loan Documents, but that it hid those nonetheless to reap the millions in fees and interest, while offloading the risk to a commercial mortgage-backed securities trust.

On the merits of the defense, Plaintiff claims that 390 Park does not allege "a duty to disclose, a material fact or reasonable reliance by the Borrower." Br. at 12. First, the answer alleges that the Original Lender knew that the "combination of the Loan it was proposing and the

interests in the Ground Lease (rather than the land itself) that served as collateral for the Loan" would wreak havoc on the refinanceability or repayment of the Loan. Amended Answer ¶116, *see also id.* ¶¶117-120. Plaintiff's focus on whether the answer "allege[d] that the <u>Trust</u> had a duty to disclose" misses the point; it is whether the Original Lender should have disclosed what it knew. Br. at 12 (emphasis added). The answer states that the Original Lender knew of these issues and should have disclosed them; the Plaintiff takes issue with the fact that the answer does not use the magic words "duty to disclose" again elevates form over substance. *See id.*; *see also Sallee v. Fort Knox Nat'l Bank*, 286 F.3d 878, 896 (6th Cir. 2002) ("Where one party to a contract knows the other relies on him to disclose all material facts, the duty rests on him not to conceal anything material to the bargain or assume responsibility for damage caused by the concealment."); *Escobar v. Wells Fargo Bank, N.A.*, No. CV-11-285-TUC-DCB, 2011 WL 6794032, at *3 (D. Ariz. Nov. 9, 2011) ("[A]t least in some traditional lender-borrower relationships, a duty to disclose exists which could create a material question of fact to survive pleadings.").

Furthermore, Plaintiff claims that 390 Park does not plead enough (Br. at 11-13) but ignores that 390 Park gives the who, what, when, where, and how sufficient for pleading purposes where another party is in possession of the applicable facts and knowledge. 390 Park identifies the party making the statements (or omissions), Original Lender, during the negotiations, and that the Original Lender concealed what it knew in an effort to reap the benefits for itself, and any successors in interest, for as long as it could. *See* Amended Answer at ¶¶116-120; *see also Kershaw v. Nautica S.A. Ltd.*, 885 F. Supp. 617, 621 (S.D.N.Y. 1995) (noting that the FRCP 9(b) pleading "rule is relaxed regarding matters that are distinctively within a[nother] party's knowledge" and a pleading only need to include "a statement of facts upon which the

belief is founded" and the "source of the information and the reasons upon which the belief is founded"). 390 Park explains all of this in the amended answer with the facts that are available to it. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006) (denying motion to dismiss fraudulent inducement claim).

Next, Plaintiff's claim that "the alleged misrepresentation was not of a material fact" and "must relate to the terms or conditions of the loan itself" is easily dispensed with — particularly on a motion to dismiss where all allegations are presumed true. Br. at 12 (citing *Camofi Master LDC v. College P'Ship, Inc.*, 452 F. Supp. 2d 462, 474 (S.D.N.Y. 2006)). Materiality is also typically a question of fact, and so is inappropriate to resolve on a motion to dismiss. And Plaintiff's notion that the facts did not "relate to the terms or conditions of the loan itself" (Br. at 12) ignores that the actual allegations of the amended answer discuss the very provisions of the loan, specifically stating that "Original Lender inserted provisions in the Loan" that would allow it to "secure millions in fees and charges over the life of the Loan," while "offloading any risk into the securitized CMBS trust with no remaining exposure to it." Amended Answer ¶¶116, 119-120. Indeed, Plaintiff itself essentially acknowledges that the defense is related to the Loan Documents and their terms when it cites several boilerplate provisions of the Loan Documents dealing with the management and administration of the property (which are, nonetheless, irrelevant for purposes of determining whether 390 Park was fraudulently induced to enter the loan). Br. at 13.

Moreover, that the rent reset was in the "pre-existing Ground Lease," as Plaintiff puts it, and not a provision in the Loan Documents themselves (Br. at 12), ignores that the Loan Documents are replete with provisions that reference and incorporate the Ground Lease, and granted the Original Lender certain rights with respect to the Ground Lease. *See* Dkt. No. 1-2

(Loan at §4.1.37 (Ground Lease covenants providing Lender with certain rights); *id.* at §7.5.1 (creating Ground Rent Reserve Fund account for Property); *id.* at §8.1(x) (certain actions regarding the Ground Lease considered events of default). Indeed, even the Loan defines "Property" as "the Ground Lease, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage." *Id.* at §1.1, p. 14. Plainly, the terms of the Ground Lease are inextricably linked to the Loan Documents that secure the collateral in that very same Ground Lease.

Finally, 390 Park alleged that it "justifiably relied on the Original Lender's omissions of those highly material facts." Amended Answer ¶118. The highly fact-intensive inquiry related to whether reliance is reasonable or justifiable "is not generally a question to be resolved" on a motion to dismiss. *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1045 (2015).[5]

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion to dismiss 390 Park's counterclaims with prejudice. In the alternative, because a number of the purported issues Plaintiff identifies are purely technical, the Court should grant 390 Park leave to make any technical amendments (although 390 Park does not believe they are necessary) to replead these counterclaims.

---

[5] The various Loan Documents' statements that the Borrower was not relying on the Original Lender "in connection with the ownership and operation of the Property" or relying on "any statements, representations or recommendations of Lender" ignores that the basis for this fraud claim is that the Original Lender knew about the problems the unique structure at the Property combined with the commercially impracticable rent reset but did <u>not</u> disclose them. Amended Answer ¶¶116-120. 390 Park could not have waived reliance on a material omission. Moreover, the provision of the Loan cited by Plaintiff to suggest that 390 Park cannot claim reliance only states that 390 Park was waiving claims "unrelated to such documents [the Loan Documents] which Borrower may otherwise have against any assignor of such documents." Br. at 13 (citing Loan §10.15). Plainly, this defense is related to the Loan Documents.

Dated:   New York, New York
         September 18, 2017

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By:      /s/ Raymond Nicola Hannigan
              Raymond Nicola Hannigan

Two Park Avenue,
New York, New York 10016
Tel:  (212) 592-1462
Email:  rhannigan@herrick.com

*Attorneys for Defendant*
  *390 Park Avenue Associates, LLC*